# EXHIBIT A

**CONN LAW, PC**
Elliot Conn, Bar No. 279920
elliot@connlawpc.com
100 Bush Street, Suite 1580
San Francisco, CA 94104
Telephone: (415) 417-2780
Facsimile: (415) 358-4941

**CARNEY BATES & PULLIAM, PLLC**
Randall K. Pulliam (*pro hac vice* admission application forthcoming)
rpulliam@cbplaw.com
One Allied Drive, Suite 1400
Little Rock, AR, 72202
Telephone: (501) 312-8500

**JACOBSON PHILLIPS PLLC**
Joshua R. Jacobson (*pro hac vice* admission application forthcoming)
joshua@jacobsonphillips.com
2277 Lee Road, Ste. B
Winter Park, FL 32789
Telephone: (321) 447-6461

*Attorneys for Plaintiff John Revell and the Proposed Classes*

ELECTRONICALLY
**F I L E D**
*Superior Court of California,*
*County of San Francisco*

**06/10/2025**
**Clerk of the Court**
BY: SAHAR ENAYATI
**Deputy Clerk**

**IN THE SUPERIOR COURT FOR THE STATE OF CALIFORNIA**

**IN AND FOR THE COUNTY OF SAN FRANCISCO**

| | |
|---|---|
| JOHN REVELL, individually, on behalf of all others similarly situated, and on behalf of the general public,<br><br>Plaintiff,<br><br>v.<br><br>GRANT MONEY, LLC; KIKOFF INC.; and DOES 1-10, inclusive,<br><br>Defendants. | Case No.:<br><br>**CGC-25-626107**<br><br>CLASS ACTION<br><br>**COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF FOR VIOLATIONS OF:**<br>    **(1) THE MILITARY LENDING ACT, 10 U.S.C. § 987, *et seq*.; and**<br>    **(2) THE TRUTH IN LENDING ACT, 15 U.S.C. § 1601, *et seq*.**<br>    **(3) GEORGIA PAYDAY LOAN ACT O.C.G.A. § 16-17-1, *et seq*.**<br>**Unlimited Civil Case**<br><br>**Complex Designated Requested**<br><br>**JURY TRIAL DEMANDED** |

CLASS ACTION COMPLAINT AND JURY DEMAND

Plaintiff John Revell, a Staff Sergeant in the U.S. Army ("Plaintiff" or "Sgt. Revell"), on behalf of himself and all others similarly situated, and on behalf of the general public, alleges the following based upon personal knowledge as to himself and upon information and belief and the investigation of his counsel as to all other matters, and brings this Class Action Complaint against Grant Money, LLC, d/b/a Grant; Kikoff Inc., (collectively "Grant" or "Defendants"); and DOES 1 through 10, inclusive, and alleges as follows:

**NATURE OF THIS ACTION**

1. This Complaint seeks to protect active-duty military service members from Grant's predatory lending practices that violate the Military Lending Act, 10 U.S.C. § 987, *et seq.* ("MLA"). Plaintiff also seeks to protect a nationwide class and class of Georgia residents from Defendants' violations of the Truth in Lending Act, 15 U.S.C. § 1601, *et seq.* ("TILA"), and the Georgia Payday Loan Act ("PLA"), O.C.G.A. § 16-17-2, *et seq*. The MLA was enacted to protect United States active-duty service members and their dependents (collectively, "Covered Members") from predatory lending. Excessive debt endangers our nation's military readiness and is detrimental to service-member retention, morale, household stability, security clearances, and career advancement. Notably here, Grant makes no effort to fulfill its duty to determine whether it is lending to Covered Members or to provide legally mandated protections for them.

2. Grant is in the business of payday lending through an earned wage access ("EWA") product it calls cash advances—it makes cash advances to its customers, who repay principal and finance charges (including expedite fees and subscription charges) on payday ("Cash Advance"). Defendants are interrelated companies that, together, offer Cash Advances through the "Grant: Cash Advance" smartphone application.

3. Defendants' business model entails making high-frequency, short-term, and high-cost loans to consumers living paycheck to paycheck. Despite advertising its loans as "no interest" and promising no mandatory fees, in practice, Grant takes in **triple** and **quadruple-digit** finance charges on loans it issues. These APRs can reach absurd heights, with some of Defendants' loans to Plaintiff exceeding **1000%** APR. Defendant's financial product extracts

1

CLASS ACTION COMPLAINT AND JURY DEMAND

exorbitant fees from workers, encourages serial usage and dependance on the costly loans, worsens workers' financial circumstances, and traps them in a cycle of debt.

4. Plaintiff, a Staff Sergeant in the U.S. Army, has used Grant's cash advance product, which it refers to simply as "Cash Advance." By virtue of the sky-high fees charged for loaned cash, Grant has extended consumer credit to Plaintiff on numerous occasions in violation of the MLA, TILA, and PLA.

5. Borrowing money that is repaid on payday is not an innovation; it is a loan. As EWA products have become more popular, the parallels to payday lending are striking. Like payday loans, EWA products trap users in a cycle of reborrowing that increases their financial distress, all in service of generating revenue for predatory lenders. Considering the substance of the transactions, Defendants' Cash Advance transactions constitute consumer credit.

6. In violation of the MLA, Defendants use their cash advance product to saddle Covered Members with charges that, on average, yield a military annual percentage rate ("MAPR") well in excess of the MLA's legal limit.

7. Grant's consumer credit agreements violate the MLA in at least five ways: By (1) charging interest above the 36% statutory MAPR cap; (2) failing to provide any credit disclosures required by the MLA; (3) including a purported class action ban and waiver of jury trial; (4) including a mandatory binding arbitration clause; and (5) using a method of access to a deposit, savings, or other financial account maintained by the borrower as security for the obligation. 10 U.S.C. §§ 987(b), (c) & (e)(1)(2)(5)(6).

8. Among the abusive lending practices that the MLA was designed to curb was predatory payday loans made to servicemembers.[1] In a Department of Defense report on predatory lending practices affecting military members (the "Report"), the egregious lending practices prevalent in the payday lending industry were highlighted.[2] The Report noted that payday lenders were "heavily concentrated around military bases," with statistics showing that

---

[1] *Report on Predatory Lending Practices Directed at Members of the Armed Forces and Their Dependents*, U.S. DEP'T OF DEFENSE (Aug. 9, 2006), available at https://apps.dtic.mil/sti/pdfs/ADA521462.pdf.
[2] *Id.* at 10–16.

CLASS ACTION COMPLAINT AND JURY DEMAND

communities with military installations "rank among the most heavily targeted communities in their respective states."[3] Military populations were targeted for an obvious reason: "active-duty military personnel are three times more likely than civilians to have taken out a payday loan," with such loans costing servicemembers over $80 million in abusive fees annually as of 2005.[4]

9.    Grant systematically violates the Truth in Lending Act by failing to make required disclosures concerning the interest rate charged as part of its loan agreements with consumers.

10.    And despite Georgia outlawing payday lending, Defendants have offered a short-term, high-cost cash-advance product to Georgia consumers for years. In violation of Georgia law, Defendants have used this product to extract from Georgia consumers charges that yield annual percentage rates ("APRs") drastically exceeding the legal limit.

11.    Grant's business practices violate the MLA, TILA, and PLA and are part of a systematic nationwide policy and practice. Sgt. Revell seeks to hold Defendants accountable for their actions and prevent their predatory lending practices from continuing.

## PARTIES

12.    Plaintiff is an individual, over 18 years of age. At all times relevant, Sgt. Revell was a natural person and resident of Fort Benning, Georgia. He has been a member of the U.S. Army for over 15 years. During the class period, Sgt. Revell was a Covered Member and an active-duty service member employed by the United States Army.

13.    Defendant Grant Money, LLC, d/b/a Grant, is a Delaware corporation with its principal place of business in San Francisco, California. Grant has offered loan agreements to consumers, including Covered Members, since at least 2024, entering into at least thousands of credit transactions.

14.    Defendant Kikoff Inc. is a Delaware corporation with its principal place of business in San Francisco, California. Kikoff Inc. operates the Grant: Cash Advance smartphone application. When a user connects his bank account to the Grant application via Plaid, Kikoff is listed as the entity connecting to the account. Moreover, in the Grant smartphone application's

---

[3] *Id.* at 10–11.
[4] *Id.* at 11.

CLASS ACTION COMPLAINT AND JURY DEMAND

listings in the Apple and Android app stores, the developer of the application is identified as Kikoff Inc.

15.    Defendants DOES 1 through 10 are persons or entities whose true names and capacities are presently unknown to Plaintiff and who therefore are sued by such fictitious names. Plaintiff is informed and believes and thereon allege that each of the fictitiously named Defendants perpetrated some or all of the wrongful acts alleged herein, are responsible in some manner for the matters alleged herein and are jointly and severally liable to Plaintiff. Plaintiff will seek leave of court to amend this complaint to state the true names and capacities of such fictitiously named Defendants when ascertained.

## TOLLING OF THE STATUTE OF LIMITATIONS

16.    The Servicemember Civil Relief Act ("SCRA"), 50 U.S.C. § 3901, *et seq.*, tolls any and all limitations or repose periods for all active-duty military members, including those similarly situated to Sgt. Revell, until their active-duty service concludes. Specifically, § 3936(a) of the SCRA provides:

> The period of a servicemember's military service may not be included in computing any period limited by law, regulation, or order for the bringing of any action or proceeding in a court, or in any board, bureau, commission, department, or other agency of a State (or political subdivision of a State) or the United States by or against the servicemember or the servicemember's heirs, executors, administrators, or assigns.

## JURISDICTION AND VENUE

17.    Venue is proper in the County of San Francisco because Defendants are headquartered in San Francisco County and all Defendants coordinated business operations in California, did business in California and in San Francisco County, and committed the wrongful lending practices alleged herein in San Francisco County.

18.    This Court has jurisdiction over Defendants, because it, at all times relevant herein, regularly conducted business in San Francisco County, California.

//

//

//

CLASS ACTION COMPLAINT AND JURY DEMAND

## LEGAL BACKGROUND

### The MLA Was Specifically Designed to Curb Predatory Payday Loans to Covered Members

19.     The DoD's Report on lending practices discussed the payday lending industry at length.[5] The Report noted that payday lenders were "heavily concentrated around military bases," with statistics showing that communities with military installations "rank among the most heavily targeted communities in their respective states."[6]

20.     Military populations were targeted for an obvious reason: "active-duty military personnel are three times more likely than civilians to have taken out a payday loan," with such loans costing servicemembers millions in abusive fees.[7] Moreover, the military payment architecture, and the Uniform Code of Military Justice to which servicemembers are bound, make them particularly vulnerable to predatory payday loans:

> Check-holding, a central feature of payday loans, is particularly risky for military borrowers. Every payday loan involves a prospective "bad" check. Military borrowers are required to maintain bank accounts in order to receive direct deposit of military pay and are subject to the Uniform Code of Military Justice that penalizes deliberately writing a check not covered by funds on deposit. Borrowers become trapped in repeat borrowing or renewals of loans in order to keep the check used to obtain the loan from bouncing, a key reason that payday loans are debt traps.[8]

21.     While the precise EWA product offering was developed somewhat recently, its genre (small-dollar, short-duration, high-cost loans) is nothing new. In 2006, the DoD noted military "borrowers encounter[ed] a booming virtual market of small loan offers, payday loans, and 'military loans' via the Internet."[9] Those loans, like Grant's, "are delivered and collected online through electronic fund transfer."[10]

---

[5] Report, *supra* n.1.
[6] *Id.* at 10–11.
[7] *Id.* at 11.
[8] *Id.* at 14. To be sure, EWA providers like Grant do not collect physical checks from their customers at loan initiation, but instead takes a virtual check by requiring Covered Members to authorize automatic debits from bank accounts to repay their loans.
[9] *Id.* at 15.
[10] *Id.* at 16.

CLASS ACTION COMPLAINT AND JURY DEMAND

22.    The Report noted key similarities between the various predatory lending products—including payday loans and internet loans—that target the military, which accurately encapsulate Grant's business model:

(1) Predatory lenders seek out young and financially inexperienced borrowers who have bank accounts and steady jobs, but also have little in savings, flawed credit or have hit their credit limit. These borrowers are less likely to weigh the predatory loan against other opportunities and are less likely to be concerned about the consequences of taking the loan.

(2) Predatory lenders make loans based on access to assets (through checks, bank accounts, car titles, tax refunds, etc.) and guaranteed continued income, but not on the ability of the borrower to repay the loan without experiencing further financial problems.[11]

(3) . . . Increasingly the Internet is used to promote loans to Service members.

(4) Predatory products feature high fees/interest rates, with some requiring balloon payments, while others pack excessive charges into the product. The result of their efforts is to obfuscate the comparative cost of their product with other options available to the borrower.

. . .

(6) Predatory lenders attempt to work outside of established usury limits, either by attempting to obtain exemptions from federal and state statutes or by developing schemes designed to circumvent existing laws.[12]

23.    The Report further found "high interest loans, whether provided as a payday loan, military installment loan, or as a result of unscrupulous automobile financing can leave a Service member with enormous debt, family problems, difficulty maintaining personal readiness and a

---

[11] To that end, lenders' "use of checks, access to bank accounts, [and similar other methods of extracting repayment] pressure the borrow to consider loan payments as being their top priority." *Id.* at 44.
[12] *Id.* at 21–22.

CLASS ACTION COMPLAINT AND JURY DEMAND

tarnished career."[13] As if being trapped in a debt cycle is not bad enough, some servicemember victims of payday and other lenders experienced disciplinary action (ranging from reprimands to "loss of promotions and separation from the military") as a result of their financial hardship.[14]

24. Drawing from the bountiful evidence of servicemember abuse at the hands of predatory lenders, the DoD concluded it could not "prevent predatory lending without assistance from Congress, the state legislatures, and federal and state enforcement agencies."[15]

25. To curb usurious interest rates, excessive annual percentage rates ("APRs"), and bogus fees, the DoD requested legislation that would prevent lenders from preying on service members and endangering the nation's military readiness.[16]

26. The American Bar Association and others expressed support for the DoD's request, noting the urgent need for remedial Congressional action to curb predatory loan practices harming Service members. The legislation requested was supported by the DoD, military and veterans organizations, legal aid organizations, consumer advocacy groups, faith-based organizations, and of course lawmakers.

27. Congress answered the call and passed the MLA to protect Covered Members from unfair, deceptive, and excessively priced loans.

### The Military Lending Act

28. In the wake of the DoD's investigations, in 2006, the Military Lending Act, 10 U.S.C. § 987, *et seq.*, was enacted.

---

[13] *Id.* at 39.
[14] *Id.* at 41–42.
[15] *Id.* at 46.
[16] Specifically, the DoD requested legislation protecting Service members "from unfair, deceptive lending practices and usurious interest rates and to require uniform disclosure of credit and terms. Specifically, lenders should not be permitted to base loans on prospective bad checks, electronic access to bank accounts, mandatory military allotments, or titles to vehicles. All costs involved in borrowing should be included in interest rate calculations and disclosures. Laws and regulations must be changed to close regulatory loopholes that leave non-resident military borrowers unprotected in many states." *Id.*

CLASS ACTION COMPLAINT AND JURY DEMAND

29.     The MLA makes it unlawful for a creditor to "impose an annual percentage rate of interest greater than 36 percent with respect to the consumer credit extended to a Covered Member or a dependent of a Covered Member." 10 U.S.C. § 987(b).

30.     The MLA also requires mandatory disclosures in "consumer credit"[17] transactions with Covered Members, which include:

- A statement of the annual percentage rate of interest applicable to the extension of credit, 10 U.S.C. § 987(c)(1)(A);

- Any disclosures required under the Truth in Lending Act, 10 U.S.C. § 987(c)(1)(B); and

- A clear description of the payment obligations of the member or dependent, as applicable, 10 U.S.C. § 987(c)(1)(C).

31.     Additionally, the MLA prohibits creditors from including provisions in a consumer-credit transaction that require the Covered Borrow to submit to arbitration or to waive the borrower's right to legal recourse. 10 U.S.C. § 987(e).

32.     The MLA also makes it unlawful to use a check or other method of access to a deposit, savings, or other financial account maintained by the borrower as security for the obligation. 10 U.S.C. § 987(e).

**The Truth in Lending Act**

33.     The Truth in Lending Act, codified at 15 U.S.C. § 1638, protects consumers by, *inter alia*, (i) requiring lenders to clearly disclose all terms and costs associated with loans, (ii) allowing borrowers to easily compare different credit options, and (iii) preventing predatory lending practices by making loan details transparent and standardized. In essence, TILA promotes informed use of consumer credit by providing full disclosure of loan terms.

---

[17] Under the MLA, consumer credit is defined as "credit offered or extended to a Covered Member primarily for personal, family, or household purposes," subject to a finance charge or payable by written agreement in more than four installments and outside the ambit of any of the identified exceptions.

8

CLASS ACTION COMPLAINT AND JURY DEMAND

34.    Under TILA, creditors are required to make certain disclosures when participating in closed-end credit transactions, such as those Grant offers here. Grant fails to make any of the following required disclosures:

- "The 'amount financed', using that term, which shall be the amount of credit of which the consumer has actual use," 15 U.S.C. § 1638(2)(A);
- "a statement of the consumer's right to obtain, upon a written request, a written itemization of the amount financed," *Id.* at § 1638(2)(B);
- "The 'finance charge', not itemized, using that term," *id.* at § 1638(3);
- "The finance charge expressed as an 'annual percentage rate', using that term," *Id.* at § 1638(4);
- "The number, amount, and due dates or period of payments scheduled to repay the total of payments," *Id.* at § 1638(6);
- "Descriptive explanations of the terms 'amount financed', 'finance charge', 'annual percentage rate', 'total of payments', and 'total sale price' as specified by the Bureau," *Id.* at § 1638(8);
- "Where the credit is secured, a statement that a security interest has been taken in (A) the property which is purchased as part of the credit transaction, or (B) property not purchased as part of the credit transaction identified by item or type," *Id.* at § 1638(9);
- "A statement indicating whether or not the consumer is entitled to a rebate of any finance charge upon refinancing or prepayment in full pursuant to acceleration or otherwise, if the obligation involves a precomputed finance charge," *Id.* at § 1638(11); and
- "A statement that the consumer should refer to the appropriate contract document for any information such document provides about nonpayment, default, the right to accelerate the maturity of the debt, and prepayment rebates and penalties," *Id.* at § 1638(12).

//

9

CLASS ACTION COMPLAINT AND JURY DEMAND

**The Georgia Payday Loan Act**

35.    Payday lending involves offering short-term loans, often for small amounts, with repayment expected on the borrower's next payday. These loans are frequently marketed as a quick solution for bridging financial gaps between paychecks.

36.    Lenders have offered payday loans for decades. While they have taken many forms, one of the unifying characteristics of payday lending has been that lenders have created different artifices, evolving contractual arrangements, and structures to evade usury caps for such loans.

37.    In the past, lenders disguised payday loans as "wage buying," where lenders claimed to be purchasing earned wages, although in reality they were simply issuing loans at usurious rates.

38.    Georgia's first major legislative enactment aimed at stopping payday lending was the Industrial Loan Act ("ILA"). The legislation was passed because short-term, high-cost loans trap consumers in a cycle of debt. The cycle perpetuates itself because fees charged in conjunction with payday loans reduce borrowers' paychecks and net pay each period, necessitating borrowers to obtain new loans to cover the shortfall created by the original loans.

39.    Notwithstanding the ILA, payday lending made a resurgence in the late 1990s and 2000s in newly structured transactions, such as "deferred presentment" transactions, in which the lender advanced money in exchange for a postdated check, which it agreed not to cash until a specified future date (typically the borrower's next payday).

40.    To stop these evasions, in 2004, Georgia enacted the Payday Lending Act ("PLA"). The PLA "encompasses all transactions in which funds are advanced to be repaid at a later date, notwithstanding the fact that the transaction contains one or more other elements." O.C.G.A. § 16-17-1(a). The PLA prohibits lenders from collecting any amounts on payday loans, deems payday loans void and unenforceable, and subjects payday lenders to liability for statutory damages in an amount equal to three times any charges made on an illegal payday loan, *Id.*, § 16-17-3.

CLASS ACTION COMPLAINT AND JURY DEMAND

41.     As history teaches, payday lending is simply too profitable an enterprise for many companies to resist. EWA products represent the newest generation artifice to evade Georgia usury law and bilk consumers for short-term, high-cost loans.

42.     EWA providers' cash-advance loan products (including Grant's) offer cash to borrowers in return for the authorization to debit the borrower's bank account on their payday in an amount equal to the principal cash-advance loan amount and any additional charges.

43.     Grant's cash advance product falls within the scope of the PLA because it is a "transaction[] in which funds are advanced to be repaid at a later date." O.C.G.A. § 16-17-1(a).

## FACTS

### The Earned Wage Product Market and Grant

### EWA Products Charge High Fees and Wreak Havoc on Borrowers' Financial Health

44.     A significant driver of demand for consumer credit and financial products stems from the mismatch between when a family receives income and when they pay expenses. Employees generally provide services before being paid for their labor and are typically paid in arrears on a biweekly or semi-monthly cycle. To meet liquidity challenges, consumers have for years turned to credit cards, personal installment loans, and payday loans.

45.     Recently, an old product with new packaging—coined "earned wage access" or "earned wage advance" ("EWA")—has been created and offered to consumers to address the same need. While marketed as a novel financial technology ("fintech") device, in practice, EWA products are garden variety cash advances.

46.     EWA products provide workers, before their payday, with a portion of their earned but unpaid wages or funds that purport to equal or approximate a portion of their unpaid wages. Loaned funds are repaid via automated withdrawal from the consumer's bank account.

47.     Grant is one such fintech company that provides an EWA service, which it simply calls "Cash Advance." The Grant Cash Advance service is a cash advance whereby Grant loans customers funds that are repaid on their next payday.

CLASS ACTION COMPLAINT AND JURY DEMAND

48. According to Grant, it offers: "Cash at your fingertips. Don't trip over unexpected expenses. We'll get you the cash you need – now."[18]

49. To repay these loans, users must link their bank account to their Grant profile and authorize automated debits from their linked external bank account on the scheduled repayment date.

50. EWA providers advertise their products as free, no interest, or low cost while obscuring the ways in which they bilk consumers for fees and other finance charges that add up to loan-shark rates.[19]

51. EWA providers are paid through various types of fees. Grant relies on two: (1) expedite fees, and (2) mandatory subscription fees.

52. First, **expedite fees** which Grant calls Express (or Expedited Delivery) fees are charged to provide immediate access to loan funds.

53. For Cash Advances, Grant charges between $2.00 and $8.00 for expedited delivery of loaned funds. For instance, to obtain expedited access to a $25.00 loan, a borrower must pay a $2.00 Express fee. Borrowers must pay larger fees to access larger loans.

54. The actual cost to provide customers with instant access to funds is less than $0.05.[20]

55. The speed of access to funds is an essential and defining aspect of EWA products. They are designed to address—and marketed as addressing—what is generally a less-than two-week liquidity problem.

//

//

[18] Apple App store, *Grant: Cash Advance*, https://apps.apple.com/us/app/grant-cash-advance/id6472350114 (last visited May 29, 2025).

[19] Grant, *Does Grant Charge Fees for Cash Advance,* https://support.grantcash.com/hc/en-us/articles/23473668235021-Does-Grant-charge-fees-for-Cash-Advance (last visited May 28, 2025).

[20] *Simple, Transparent, Uniform Pricing for All Financial Institutions*, THE CLEARINGHOUSE (showing cost of RTP instant credit transfer at $0.045), available at https://www.theclearinghouse.org/-/media/new/tch/documents/payment-systems/rtp_-pricing_02-07-2019.pdf.

12

CLASS ACTION COMPLAINT AND JURY DEMAND

56.     Grant's website, app, and marketing include numerous representations about the speed of access to funds, including:

- "Cash at your fingertips"

- "Get cash advance from $25 to $250 today"

- "Get Cash Fast"

- "Don't trip over unexpected expenses, we'll get you the cash you need"

- "98% of Cash Advances delivered 'instantly' arrive in our customers' linked external bank accounts within 15 minutes"

- "if you don't receive your Cash Advance within a few hours, reach out to us"

57.     While expedite fees are notionally optional and users can use an EWA product without paying one, they are difficult to access and negate their usefulness to consumers. For instance, the free, non-expedited version of an advance can take 3–5 days for users to receive, while the expedited service takes just a few minutes. This delay is problematic for Grant's intended users, consumers living paycheck to paycheck who turn to EWA providers for the precise reason that their need for cash is urgent and cannot wait.

58.     Indeed, a recent study found that the average loan term for EWA loans provided by five different companies (providing a substantially similar product to Grant Cash Advance) was only 10 days.[21] Consumers who cannot wait ten days to access their wages certainly will pay whatever fees an EWA provider charges to obtain their funds as quickly as possible. As a result, the vast majority of EWA users pay expedite fees to obtain immediate funds disbursement.[22]

59.     Turning to the second type of fee, **subscription charges** are monthly fees Grant charges its users to apply for Cash Advances.

---

[21] Lucia Constantine, Christelle Bamona, Sara Weiss, *Not Free: The Large Hidden Costs of Small-Dollar Loans Made Through Cash Advance Apps*, CTR. FOR RESPONSIBLE LENDING, at 10 (Apr. 2024) (hereinafter "*Not Free*").
[22] One recent survey found 79% of EWA users typically paid expedite fees to receive funds faster. *Not Free*, at 3. Likewise, the Consumer Financial Protection Bureau found 96% of fees paid by consumers using employer-integrated EWA providers were for expedite fees. Consumer Financial Protection Bureau, Data Spotlight: Developments in the Paycheck Advance Market (July 18, 2024), https://www.consumerfinance.gov/data-research/research-reports/data-spotlight-developments-in-the-paycheck-advance-market/.

13

CLASS ACTION COMPLAINT AND JURY DEMAND

60.    Grant forces users signing up to its service through its app to agree to a monthly $9.99 subscription fee[23] to gain access to Cash Advances. Below are a few of the screens Grant shows users while signing up for Cash Advances through the app:



Figure 1                                                          Figure 2

61.    These subscription fees are mandatory fees that must be paid to use the platform and access Grant Cash Advances. There is no mechanism available through Grant's app to sign up for Cash Advances without agreeing to biweekly subscription charges.

62.    When properly viewing EWA products' expedite fees, and subscription fees as costs of credit (*i.e.*, finance charges), the annual percentage rates ("APR") for these loans are eye-popping.

//

//

---

[23] The subscription fee has risen during the class period. $9.99 is the level of fee charged as of the date this pleading is filed.

14

63.    A recent study found the average APR imposed by EWA providers is 334%, in line with payday loans:



*Figure 3*

64.    The APR received by Grant for its Cash Advance product is similar and often ***much higher***. As discussed *infra*, Grant's loans to Sgt. Revell had APRs routinely exceeding **1000%**.

65.    Ironically, Grant and other industry participants market their products as a low-cost alternative to payday loans.[24] In truth, Grant is a wolf in sheep's clothing: extending loans with APRs nearly identical to the exorbitantly-priced payday loan products it purports to replace.

66.    The EWA "business model capitalizes on most borrowers' financial precarity, and the user interface of these products makes paying a fee or leaving a tip difficult to avoid."[25]

67.    The end result is a product that traps consumers in cycles of debt, worsens their financial circumstances, leads to more overdraft fees, and an ever-increasing reliance on emergency funds from—and the fees that come with—EWA loans.

---

[24] On its description in the Apple App Store, Grant characterizes its loan product as carrying "No interest (0% APR)."

[25] Candice Wang, Lucia Constantine, Monica Burks, Yasmin Farahi, *A Loan Shark In Your Pocket: The Perils of Earned Wage Advance*, CTR. FOR RESPONSIBLE LENDING, at 7 (Oct. 2024) (hereinafter "*Loan Shark*").

15

68.     A CRL analysis found consumers who used EWA products took out advances repeatedly, with many taking advances on the same day or the day after repayment and were consequently more likely to overdraft their accounts and be forced to pay overdraft fees. Specifically, the CRL found that 27% of EWA users take out at least 25 loan advances a year, and for 33% of users, the vast majority (80%) of their borrowing is followed by reborrowing within two weeks.[26] This suggests receiving a reduced paycheck (*i.e.*, reduced to pay back EWA loans and fees) necessitated taking out more advances in the following pay period.

69.     Another CRL study found that using EWA products is closely correlated with overdraft fees. "Overdrafts on consumers' checking accounts increased 56% on average after use of an advance product."[27]

**EWA Providers Utilize Strict Underwriting Procedures and, Consequently, Almost Always Collect**

70.     While EWA products are financially disastrous for borrowers, EWA products have proven profitable for the companies offering them. They maximize profits by using exacting underwriting procedures that ensure cash advances, and the fees that accompany them, are timely repaid through automated bank account debits that borrowers are required to authorize when taking out the loans.

71.     According to Grant's mobile application, "[n]ot all who [create an account and pay subscription fees] to Grant Plus will qualify for Grant cash advances." To be eligible for a Cash Advance, borrowers must meet minimum qualifications set by Grant.

72.     To determine whether a borrower is creditworthy and decide how much credit to extend, Grant requires users to connect their bank accounts to its app through a third-party service called Plaid.[28] Plaid partners with Grant and other fintech companies to allow them to view customers' bank account transactional data. Plaid allows Grant to "[q]uickly verify assets

---

[26] *Id.*

[27] *Not Free*, *supra* note 19, at 6.

[28] Users signing up for a Grant account through the app are shown a screen directing the user to "Simply link your bank" to "qualify for a Cash Advance"

CLASS ACTION COMPLAINT AND JURY DEMAND

and income" of prospective borrowers, providing "real-time insights into a borrower's income and employment in seconds with a breakdown of earnings from salaries, gig work, and more."[29]

73.    Grant uses its real-time insight into customer accounts to ensure borrowers will have sufficient funds to repay their loans on payday and schedule debits for the payday immediately following any given loan, ensuring the loans are paid as soon as funds become available.

74.    Grant's underwriting process is detailed and considers a range of factors, including "review of transaction history in your primary checking account. We look for a consistent source of income to understand your ability to repay. whether you have established a direct deposit into your Linked Account and an analysis of your deposits and transaction history."[30] An image that appears when determining eligibility within the app is:



*Figure 4*

75.    Grant continually adjusts maximum withdrawal amounts depending on the individual's borrowing history and financial health (as gleaned through Plaid).

---

[29] *Plaid Solutions: Credit,* Plaid.com, https://plaid.com/solutions/credit/ (last visited Mar. 23, 2025).
[30] Grant, *Checking for your Cash Advance Qualifications*, https://support.grantcash.com/hc/en-us/articles/23473574989069-Checking-for-your-Cash-Advance-qualifications (last visited May 28, 2025).

17

76.    Grant's underwriting process is both rigorous and continual. Grant advises on its website "[w]e constantly update your eligibility, so if you're not currently eligible, you can check back at any time to see your updated status."[31]

77.    Qualifying for a cash advance is by no means guaranteed. Within its mobile application Grant discloses that "[n]ot all who subscribe to Grant Plus will qualify for Grant cash advances." In practice, Grant denies cash advances to a substantial proportion of users who make an account, pay subscription fees, and seek an advance. That is, after reviewing borrowers' financials, Grant determines many of its customers are not credit worthy and declines to offer them Cash Advance access.

78.    For borrowers who qualify, Grant monitors their financial health to determine whether they are eligible and, if so, how much credit to extend based on borrowers' default risk and ability to repay. Through its constant underwriting process, Grant extends loans to borrowers only when it is confident they will repay.

79.    For qualifying borrowers, Grant generally begins by offering relatively low amounts of credit and borrowers obtain greater access to credit—*i.e.*, Grant raises their maximum loan limit—by consistently paying off loans on time and generally improving their financial health (which Grant monitors through Plaid).

80.    On a screen in its app, Grant tells users that Grant "update[s] your offered amount based on changes in your account activity. Please check again at a later time [to see if you have been approved for more money]."[32]

81.    These underwriting methodologies—extending credit only to those who will repay, and only in amounts that are likely to be repaid—are precisely the same methods used by traditional credit issuers, like banks. "US credit card lenders individualize interest rates and

---

[31] Grant, *Why Don't I Qualify for a Cash Advance Anymore? Why Do I Qualify for a Lower Cash Advance than I Used To?*, https://support.grantcash.com/hc/en-us/articles/33580998979597-Why-don-t-I-qualify-for-a-Cash-Advance-anymore-Why-do-I-qualify-for-a-lower-Cash-Advance-than-I-used-to (last visited May 28, 2025).

[32] Grant*, How Can I Qualify for a Higher Cash Advance Amount?* https://support.grantcash.com/hc/en-us/articles/33580943307277-How-can-I-qualify-for-a-higher-Cash-Advance-amount (last visited May 28, 2025).

18

CLASS ACTION COMPLAINT AND JURY DEMAND

credit limits according to assessments of customers' default risk."[33] The only distinction—that traditional lenders review credit scores and reports and borrowers' applications to determine creditworthiness while EWA providers like Grant directly review borrowers' financial accounts—is one without a difference.

82.    In addition to these loan qualification procedures, borrowers must link a checking account (that receives a consistent source of directly deposited income) and debit card to their Grant profile to ensure seamless repayment.

83.    When applying for a Cash Advance, borrowers must authorize Grant to automatically debit their loan repayment from their linked bank account on their next payday. To do so, borrowers are required to click a box, acknowledging: "I accept this advance and authorize the repayment of the total amount shown as described above . . ."

//

//

//

//

//

//

//

//

//

//

//

---

[33] Matcham, *Risk-Based Borrowing Limits in Credit Card Markets* (Mar. 10, 2015), https://willmatcham.com/img/main_rbbl_matcham_2024_08_15.pdf; *see also* Dey, Mumy, *Determinants of Borrowing Limits on Credit Cards*, Fed. Reserve Bank of Boston (2006), ("Publicly available information about borrowers' creditworthiness helps banks sort their client pool into broad risk classes by way of their credit scoring systems . . . Profit-maximizing banks choose to provide exactly the amount of credit to their borrowers that maximize their expected profits."), https://www.bostonfed.org/-/media/Documents/events/payment-choice/papers/Dey.pdf; *What are credit limits?*, Armed Forces Bank (Apr. 4, 2024) ("Financial institutions grant credit limits that allow you to use credit . . . while ensuring you can manage your payments."), https://www.afbank.com/article/what-are-credit-limits-and-how-are-they-determined.

CLASS ACTION COMPLAINT AND JURY DEMAND

84.    The app reinforces that borrowers owe a debt by, *inter alia*, showing them screens indicating the "Payback amount" due on repayment, reminding them of their "repayment date," and indicating borrowers who have taken a Cash Advance have agreed to pay the amount back:



*Figure 5*

85.    When a user requests a Cash Advance loan, the Grant app automatically schedules the repayment for the borrower's next payday.

86.    The Grant app does not include a mechanism to cancel a loan repayment once a Cash Advance has been issued.

87.    In addition, the Grant app does not allow a user to delete or remove a debit card from their account (which users must authorize Grant to debit for loan repayments and subscriptions when they create an account) once they have subscribed and/or taken out a loan. Users may *replace* their debit card but may not delete it. Accordingly, Grant deprives users of a mechanism through the app for cancelling a loan repayment.

88.    To collect from users with insufficient funds to afford repayment, Grant debits the amount available and collects the remainder the next time funds enter the account.

20

89.     In sum, Grant's underwriting process requires, before any money changes hands, that borrowers: (1) demonstrate they receive regular, consistent income (2) in an amount sufficient to cover existing obligations *and* a Grant Cash Advance; (3) link the bank account to which direct deposits are received to Grant's app through Plaid; (4) agree to pay a monthly subscription fee; (5) authorize Grant to automatically debit the linked accounts on the borrower's payday in an amount that is equal to the cash advance the borrower receives (the principal loan amount) plus fees; and (6) be current on all prior Grant Cash Advance loans and subscription charges. Borrowers who fail to complete these steps cannot obtain cash advances.

90.     Additionally, if a customer is unable to repay a loan, Grant prevents them from using the product—which cash-strapped customers are usually *dependent on*—until the loan is repaid. Likewise, users cannot disconnect their connected bank account from the Grant app while a Cash Advance is outstanding—meaning Grant deprives users of a mechanism to cancel the subscription fee through the app until all prior advances have been paid.

91.     Through these underwriting procedures and policies, Grant ensures it will be able to automatically deduct the sum of the cash-advance loan amount (the loan principal), plus any additional charges, from the linked account as soon as the borrower's next payday is deposited.

92.     These debt collection methods are so successful that EWA lenders recoup their advances at least 97% of the time using these tactics.[34]

**Grant's Loans to Plaintiff**

93.     Sgt. Revell is currently an active-duty Staff Sergeant stationed at Fort Benning in Fort Benning, Georgia.

94.     He is an active duty servicemember and has been since June 2012.

95.     Grant extended consumer credit to Plaintiff in the form of Cash Advance transactions like those discussed above.

96.     Plaintiff used the loans from Grant for personal, family, or household purposes.

---

[34] Devina Khanna and Arjun Kaushal, *Earned Wage Access and Direct-to-Consumer Advance Usage Trends*, Fin. Health Network (April 2021) at 2, available at https://cfsi-innovation-files-2018.s3.amazonaws.com/wp-content/uploads/2021/04/26190749/EWA_D2C_Advance-_sage_Trends_FINAL.pdf.

CLASS ACTION COMPLAINT AND JURY DEMAND

97.    Plaintiff paid Grant's finance charges, in the form of subscription charges, to obtain cash-advance loans from Grant.

98.    A small selection of exemplar Grant Cash Advance loans made to Plaintiff are shown in the table below, with the cost of credit and APR included:

| Date | Principal Amt. | Subscription Charges[35] and/or Expedited Delivery Fees | Loan Period | APR |
|------|----------------|---------------------------------------------------------|-------------|-----|
| 1/23/25–1/29/25 | $100.00 | $19.99 | 6 days | 608% |
| 2/20/25–2/25/25 | $100.00 | $14.99 | 5 days | 1094% |
| 5/12/25–5/14/25 | $75.00 | $7.99 | 2 days | 1944% |

99.    Sgt. Revell has received many usurious loans from Grant since he started using the service. For much of the time he used the product, Sgt. Revell took out a loan each pay period and was forced to take out *another loan* immediately after repayment of his last loan.

100.    The fees attendant to the loans (including, *inter alia*, expedite fees and mandatory subscription fees of $9.99) are immediately and directly connected to Grant's extensions of credit to Plaintiff.

101.    Further, Grant's credit agreement required Sgt. Revell to purportedly waive his right to a jury trial, waive his right to participate in a class action, and provide for mandatory arbitration in violation of 10 U.S.C. § 987(e)(2).

102.    Grant's credit agreement also failed to include mandatory MLA loan disclosures in violation of 10 U.S.C. § 987(c) and TILA.

## CLASS ACTION ALLEGATIONS

103.    Sgt. Revell brings this class action on behalf of himself and all other persons similarly situated and the general public. The proposed "MLA Class," "TILA Class," and "Georgia Class" (collectively the "Classes") are defined as follows:

---

[35] Monthly membership fees were included in the calculation by dividing the monthly fee by the number of advances Plaintiff took out in the month in question. *See* 32 C.F.R.§ 232.4(c)(1)(iii)(C).

CLASS ACTION COMPLAINT AND JURY DEMAND

**MLA Class**: All Covered Members and dependents of Covered Members who entered into an agreement with Grant to use its "Cash Advance" (or substantially similar) product, in which Grant was paid a finance charge (including, without limitation, an expedited transfer fee, or subscription charge).

**TILA Class**: All individuals in the United States that entered into an agreement with Grant to use its "Cash Advance" (or substantially similar) product, in which Grant was paid a finance charge (including, without limitation, an expedited transfer fee, or subscription charge).

**Georgia Class**: All Georgia residents who entered into an agreement with Grant to use its "Cash Advance" (or substantially similar) product, in which Grant was paid a finance charge (including, without limitation, an expedited transfer fee, or subscription charge).

104.    Expressly excluded from the Classes are: (a) any Judge presiding over this action and members of their families; (b) Grant and any entity in which Grant has a controlling interest, or which has a controlling interest in Grant, and its legal representatives, assigns and successors; and (c) all persons who properly execute and file a timely request for exclusion from the Classes.

105.    Sgt. Revell reserves the right to amend the Class definitions if further investigation and discovery indicates that the Class definitions should be narrowed, expanded, or otherwise modified.

### Numerosity and Ascertainability

106.    Plaintiff is unable to state the precise number of members of the classes because such information is in the exclusive control of Grant. Grant's scheme has harmed and continues to harm the members of the Classes. The members of the proposed Classes are so numerous that joinder of all members is impracticable. Grant has made millions of loans, and Sgt. Revell estimates there are, at least many thousands of consumers in the MLA Class, TILA Class, and Georgia Class. As a result, Plaintiff believes that the total Classes each number in (at least) the thousands, thus members of the Classes are so numerous that joinder of all class members is impracticable. The exact size of the proposed classes, and the identity of the members thereof, will be readily ascertainable from the business records of Grant.

CLASS ACTION COMPLAINT AND JURY DEMAND

107. The disposition of the claims of these Class members in a single action will provide substantial benefits to all parties and to the Court. Class Members are readily identifiable from information and records in Grant's possession, custody, or control.

**Commonality**

108. There are common questions of law and fact affecting the rights of each Class member and common relief by way of damages. The harm that Grant has caused or could cause is substantially uniform with respect to Class members. Common questions of law and fact that affect the Class members include, but are not limited to:

- Whether Sgt. Revell and the MLA Class members are Covered Members subject to the protections and limitations of the MLA;
- Whether Grant is a "creditor" subject to the protections and limitations of the MLA;
- Whether Grant's loans constitute an extension of "consumer credit" subject to the protections and limitations of the MLA and TILA;
- Whether Grant made loans (as that term is understood under O.C.G.A. § 16-17-2) to Plaintiff and the Georgia Class;
- Whether Grant entered into standard form loan agreements with Covered Members;
- Whether Grant's loans exceed the MLA statutory rate cap of 36% MAPR;
- Whether Grant's loans exceed the Georgia statutory usury cap;
- Whether Grant failed to provide required credit disclosures in violation of the MLA;
- Whether Grant's standard form loan agreements contain a class action waiver provision or jury trial waiver provision in violation of the MLA;
- Whether Grant's standard form loan agreements contain an arbitration clause in violation of the MLA;
- Whether Grant failed to provide required credit disclosures in violation of TILA;
- Whether each month Grant charged interest to Sgt. Revell and Class Members it

24

CLASS ACTION COMPLAINT AND JURY DEMAND

restarted the statute of limitations under the MLA;

- Whether each month that Sgt. Revell and the Class Members paid money to Grant it restarted the statute of limitations under the MLA;

- Whether Class members are entitled to actual or statutory damages for the aforementioned violations and, if so, in what amounts;

- Whether Grant should be enjoined from continuing its lending practices in the manner challenged herein;

- Whether Grant is subject to punitive damages, and, if so, the proper measure of such damages and remedies to which Sgt. Revell and the Class are entitled under 10 U.S.C. § 987(f)(5); and

- Any declaratory and/or injunctive relief to which the Classes are entitled.

**Typicality**

109.    The claims and defenses of Sgt. Revell are typical of the claims and defenses of the MLA Class because Sgt. Revell is a Covered Member and loan agreements with Grant are typical of the type of personal, household, or family loans that Grant normally provides to Covered Members. Additionally, Grant uses the same or substantially similar standard form loan agreement in all of its lending transactions. The documents involved in the transaction were standard form documents and the violations are statutory in nature. For similar reasons, the claims and defenses of Sgt. Revell are typical of the claims and defenses of the TILA Class and Georgia Class. Sgt. Revell suffered damages of the same type and in the same manner as the Classes he seeks to represent. There is nothing peculiar about Plaintiff's claims. Plaintiff has no interests antagonistic to the interests of the other members of the Classes.

**Adequate Representation**

110.    Sgt. Revell will fairly and adequately assert and protect the interests of the Classes. Sgt. Revell has hired attorneys who are experienced in prosecuting class action claims and will adequately represent the interests of the Classes, and Sgt. Revell has no conflict of interest that will interfere with maintenance of this class action.

111.    Plaintiff and his counsel are committed to vigorously prosecuting the action on

CLASS ACTION COMPLAINT AND JURY DEMAND

behalf of the Classes and have the financial resources to do so. Neither Plaintiff nor his counsel have interests adverse to those of the Classes.

**Predominance and Superiority**

112.    The common questions of law and fact set forth herein predominate over any questions affecting only individual Class members. A class action provides a fair and efficient method for the adjudication of this controversy for the following reasons which is superior to the alternative methods involved in individual litigation:

- The Classes are so numerous as to make joinder impracticable. However, the Classes are not so numerous as to create manageability problems. There are no unusual legal or factual issues that would create manageability problems. Prosecution of separate actions by individual members of the Classes would create a risk of inconsistent and varying adjudications against Defendants when confronted with incompatible standards of conduct;

- Adjudications with respect to individual members of the Classes could, as a practical matter, be dispositive of any interest of other members not parties to such adjudications, or substantially impair their ability to protect their interests; and

- The claims of the individual Class members are small in relation to the expenses of individual litigation, making a Class action the only procedural method of redress in which Class members can, as a practical matter, recover.

113.    The proposed Classes fulfill the certification criteria of Code of Civil Procedure § 382.

**FIRST CAUSE OF ACTION**
**(Violations of the Military Lending Act, 10 U.S.C. § 987, _et seq._)**
**(On Behalf of Plaintiff and the MLA Class against Defendants)**

114.    Plaintiff re-alleges and incorporates by reference herein the allegations set forth in the paragraphs 1–113 above.

115.    The MLA prohibits a creditor from obligating a "Covered Member" or dependent of a Covered Member (collectively, "Covered Members") to a loan in excess of 36% MAPR.

26

CLASS ACTION COMPLAINT AND JURY DEMAND

116. A "Covered Member" in the statute is a "member of the armed forces who is on active duty under a call or order that does not specify a period of 30 days or less."

117. "The MAPR is the cost of the consumer credit expressed as an annual rate." 32 C.F.R. § 232.3. The MAPR includes as relevant here, "finance charges associated with the consumer credit" and "[a]ny fee imposed for participation in any plan or arrangement for consumer credit." 32 C.F.R. § 232.4.

118. Sgt. Revell and the MLA Class Members are "Covered Members," subject to the protections and limitations imposed by the MLA. A Covered Member is a consumer who, at the time the consumer becomes obligated on a consumer credit transaction or establishes an account for consumer credit, is a Covered Member of the armed forces or a dependent of a Covered Member (as defined in 32 CFR 232.3(g)(2) and (g)(3)).

119. Sgt. Revell is considered a "Covered Member" with respect to his Grant loan agreements because Sgt. Revell is an active duty service member who is obligated by law to repay loans he took out for personal, family or household purposes.

120. Grant is a "creditor" subject to the requirements and limitations imposed by the MLA in that it engages in the business of extending consumer credit to Covered Members protected by the MLA. 10 U.S.C. § 987(i)(5); also 32 C.F.R. § 232.3(i).

121. The underlying loan transactions at issue in this case constitute "consumer credit" subject to the protections and limitations imposed by the MLA because they are "credit offered or extended to a Covered Member primarily for personal, family, or household purposes," subject to a finance charge and outside the ambit of any of the identified exceptions. 32 C.F.R. § 232.3(f)(1)(i); also 10 U.S.C. § 987(i)(6).

122. Grant charged Sgt. Revell and the MLA Class well above the 36% interest rate cap on their loans, in violation of the MLA.

123. Grant fails to make all the disclosures required by 10 U.S.C. § 987(c)(1)(A) and 32 C.F.R. § 232.6 in its standard form loan agreements, in violation of the MLA.

124. Grant's standard form loan agreements include mandatory arbitration agreements in violation of 10 U.S.C. § 987(e)(3).

125.    Grant's standard form loan agreements include class action waivers and jury trial waivers in violation of 10 U.S.C. § 987(e)(2).

126.    Grant uses a check or other method of access to a deposit, savings, or other financial account maintained by the borrower as security for the Cash Advance obligations.

127.    As a result, Grant violates 10 U.S.C. § 987.

128.    Accordingly, pursuant to 10 U.S.C. § 987(f)(5), on behalf of the MLA Class, Plaintiff seeks an order from the Court awarding statutory damages in the amount of $500 per violation, actual and punitive damages, along with injunctive relief pursuant to 10 U.S.C. § 987(f)(5)(A).

129.    Plaintiff is entitled to an award of attorneys' fees and costs pursuant to 10 U.S.C. § 987(f)(5)(B).

WHEREFORE, Plaintiff prays for relief as set forth below.

**SECOND CAUSE OF ACTION**
**(Violations of the Truth In Lending Act, 15 U.S.C. § 1601, *et seq.*)**
**(On Behalf of Plaintiff and the TILA Class against Defendants)**

130.    Plaintiff re-alleges and incorporates by reference herein the allegations set forth in the paragraphs 1–113 above.

131.    TILA and Regulation Z require creditors to provide consumers with specified disclosures for closed-end credit transactions. 15 U.S.C. § 1638; 12 C.F.R. §§ 1026.17, 1026.18. Grant's loan agreements are closed-end credit transactions because they are not open-end credit transactions. Open-end credit transactions are "a plan under which the creditor reasonably contemplates repeated transactions, which prescribes the terms of such transactions, and which provides for a finance charge which may be computed from time to time on the outstanding unpaid balance." 15 U.S.C. § 1602.

132.    Among other requirements, the Regulation prescribes the format of the disclosures, as well as disclosure of certain terms themselves, such as the annual percentage rate and finance charge. 12 C.F.R. §§ 1026.17, 1026.18.

133.    Grant is a creditor whose financing qualifies as "credit" under TILA and Regulation Z, and its loan agreements with consumers are therefore subject to TILA and

28

CLASS ACTION COMPLAINT AND JURY DEMAND

Regulation Z's disclosure requirements. See 12 C.F.R. § 1026.2(a)(14).

134. Grant has not provided such disclosures before consummation of the loan agreements.

135. Grant failed to provide such disclosures to Sgt. Revell and the TILA Class.

136. As a result, Grant violated TILA and Regulation Z. 15 U.S.C. § 1638; 12 C.F.R. §§ 1026.17 & 1026.18.

137. Accordingly, pursuant to 15 U.S.C. § 1640, on behalf of the TILA Class, Plaintiff seeks an order from the Court awarding actual damages and statutory damages and attorneys' fees and costs.

WHEREFORE, Plaintiff prays for relief as set forth below.

**THIRD CAUSE OF ACTION**
**(Violations of the Georgia Payday Loan Act, O.C.G.A. § 16-17-1, *et seq.*)**
**(On Behalf of Plaintiff and the Georgia Class against Defendants)**

138. Plaintiff re-alleges and incorporates by reference herein the allegations set forth in the paragraphs 1–113 above.

139. Plaintiff brings this claim individually and on behalf of the Georgia Class.

140. Defendants engaged in the business of making, offering, arranging, or acting as an agent in the making of loans of $3,000.00 or less. O.C.G.A. §§ 16-17-2(a), (b).

141. Defendants are not a bank or credit union and are not licensed under any Georgia law to engage in that business.

142. Defendants do not meet any of the statutory exceptions to the general prohibition against the making of loans of $3,000.00 or less. See O.C.G.A. §§ 16-17-2(a)(1)-(4).

143. Plaintiff and the Georgia Class are borrowers who obtained cash-advance loans from Defendants and paid interest and other charges in connection with those loans.

144. Defendants advanced funds to Plaintiff to be repaid at a later date.

145. Defendants' conduct described herein violated and continues to violate the PLA, which means that the loans of Plaintiff and the Georgia Class were void ab initio, that Defendants are barred from collecting any amounts on those loans, and that Defendants are additionally liable to Plaintiff and the members of the Georgia Class for three times the amount

29

of any interest or other charges, and attorneys' fees and costs. See O.C.G.A. § 16-17-3.

146. Accordingly, Plaintiff, individually and on behalf of the class, requests: (i) payment of all principal of any loans repaid in the last 20 years; (ii) payment of triple the amount of any fees, or other amounts repaid in the last 20 years; (iii) a declaration that Plaintiff's and the Georgia Class members' loans are void ab initio; (iv) and an order prohibiting Defendants from attempting to debit Plaintiff's or the Georgia Class members' bank accounts to repay any cash advances.

## **PRAYER FOR RELIEF**

WHEREFORE, on behalf of the Classes, Plaintiff prays for judgment against Grant as follows:

  a. That the Court determine that this action may be litigated as a class action and that Plaintiff and his counsel be appointed class representative and class counsel, respectively;

  b. That the Court enter judgment against Grant and in favor of Plaintiff and the Classes on all counts;

  c. That the Court find and declare that Sgt. Revell and MLA Class Members' standard form loan agreements violate the MLA;

  d. That the Court find and declare that Grant violated the MLA and award Sgt. Revell and MLA Class Members actual damages of not less than $500 per violation pursuant to 10 U.S.C. § 987(f)(5)(A)(i);

  e. That the Court award Sgt. Revell and MLA Class Members punitive damages pursuant to 10 U.S.C. § 987(f)(5)(A)(ii);

  f. An order awarding the members of the Class actual, statutory, treble, and all other damages available by law, with pre- and post-judgment interest;

  g. An order providing Plaintiffs and the members of the Classes restitution for any principal, interest, fees, or other charges paid to Defendants;

  h. An order declaring the cash advances that Plaintiff and the Georgia Class members obtained were or are void ab initio;

30

CLASS ACTION COMPLAINT AND JURY DEMAND

    i.   And order preventing Defendants from attempting to collect cash advances from Plaintiff and the Class members;

    j.   That the Court find and declare that Grant violated TILA and award Sgt. Revell and the TILA Class actual damages and statutory damages pursuant to 15 U.S.C. § 1640;

    k.   That the Court enjoin Grant from continuing to engage in predatory lending practices in violation of the MLA, TILA, and PLA;

    l.   That Grant be required by this Court's Order to compensate Plaintiff's counsel for their attorneys' fees and costs of suit, and that Grant be ordered to bear the cost of notice to the absent class members, as well as the administration of any common fund;

    m.  That the Court award interest as allowable by law;

    n.   That the Court award reasonable attorneys' fees as provided by applicable law, including under the MLA, the TILA, and/or Code of Civil Procedure § 1021.5;

    o.   That the Court award all costs of suit; and

    p.   That the Court award such other and further relief as the Court may deem just and proper.

//

//

//

//

//

//

//

//

//

//

//

//

CLASS ACTION COMPLAINT AND JURY DEMAND

Dated:  June 10, 2025

Respectfully submitted,

CONN LAW, PC

*/s/ Elliot Conn*
Elliot Conn, Bar No. 279920
elliot@connlawpc.com
100 Bush Street, Suite 1580
San Francisco, CA 94104
Telephone: (415) 417-2780
Facsimile: (415) 358-4941

JACOBSON PHILLIPS PLLC
Joshua R. Jacobson*
2277 Lee Road, Ste. B
Winter Park, FL 32789
Telephone: (321) 447-6461
Email: joshua@jacobsonphillips.com

CARNEY BATES & PULLIAM, PLLC
Randall K. Pulliam*
One Allied Drive, Suite 1400
Little Rock, AR, 72202
Telephone: (501) 312-8500
Email: rpulliam@cbplaw.com

**pro hac vice* applications forthcoming

*Attorneys for Plaintiff John Revell and the Proposed Classes*

CLASS ACTION COMPLAINT AND JURY DEMAND

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury of each and every cause of action so triable.


Dated: June 10, 2025                    Respectfully submitted,


                                        /s/ Elliot Conn
                                        Elliot Conn, Bar No. 279920
                                        *Attorneys for Plaintiff John Revell*
                                        *and the Proposed Class*

33

CM-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):* | FOR COURT USE ONLY |
|---|---|
| Elliot Conn Bar No. 279920<br>Conn Law, PC<br>100 Bush Street, Suite 1580 San Francisco CA 94104<br>TELEPHONE NO.: 415-417-2780    FAX NO. : 415-358-4941<br>EMAIL ADDRESS: elliot@connlawpc.com<br>ATTORNEY FOR *(Name):* JOHN REVELL | **ELECTRONICALLY**<br>**F I L E D**<br>*Superior Court of California,*<br>*County of San Francisco*<br>**06/10/2025**<br>**Clerk of the Court**<br>BY: SAHAR ENAYATI<br>**Deputy Clerk** |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF San Francisco
  STREET ADDRESS: 400 McAllister St.
  MAILING ADDRESS:
CITY AND ZIP CODE: San Francisco 94102
  BRANCH NAME: Civic Center Courthouse

CASE NAME:
REVELL v. GRANT MONEY, LLC, et al.

| **CIVIL CASE COVER SHEET**<br>☑ **Unlimited**   ☐ **Limited**<br>(Amount demanded exceeds $35,000)   (Amount demanded is $35,000 or less) | **Complex Case Designation**<br>☐ Counter   ☐ Joinder<br>Filed with first appearance by defendant<br>(Cal. Rules of Court, rule 3.402) | CASE NUMBER: **CGC-25-626107**<br>JUDGE:<br>DEPT.: |
|---|---|---|

*Items 1–6 below must be completed (see instructions on page 2).*

1.  Check **one** box below for the case type that best describes this case:

**Auto Tort**
☐ Auto (22)
☐ Uninsured motorist (46)
**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
☐ Asbestos (04)
☐ Product liability (24)
☐ Medical malpractice (45)
☐ Other PI/PD/WD (23)
**Non-PI/PD/WD (Other) Tort**
☑ Business tort/unfair business practice (07)
☐ Civil rights (08)
☐ Defamation (13)
☐ Fraud (16)
☐ Intellectual property (19)
☐ Professional negligence (25)
☐ Other non-PI/PD/WD tort (35)
**Employment**
☐ Wrongful termination (36)
☐ Other employment (15)

**Contract**
☐ Breach of contract/warranty (06)
☐ Rule 3.740 collections (09)
☐ Other collections (09)
☐ Insurance coverage (18)
☐ Other contract (37)
**Real Property**
☐ Eminent domain/Inverse condemnation (14)
☐ Wrongful eviction (33)
☐ Other real property (26)
**Unlawful Detainer**
☐ Commercial (31)
☐ Residential (32)
☐ Drugs (38)
**Judicial Review**
☐ Asset forfeiture (05)
☐ Petition re: arbitration award (11)
☐ Writ of mandate (02)
☐ Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
☐ Antitrust/Trade regulation (03)
☐ Construction defect (10)
☐ Mass tort (40)
☐ Securities litigation (28)
☐ Environmental/Toxic tort (30)
☐ Insurance coverage claims arising from the above listed provisionally complex case types (41)
**Enforcement of Judgment**
☐ Enforcement of judgment (20)
**Miscellaneous Civil Complaint**
☐ RICO (27)
☐ Other complaint *(not specified above)* (42)
**Miscellaneous Civil Petition**
☐ Partnership and corporate governance (21)
☐ Other petition *(not specified above)* (43)

2.  This case ☑ is  ☐ is not  complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
  a. ☑ Large number of separately represented parties
  b. ☑ Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
  c. ☑ Substantial amount of documentary evidence
  d. ☑ Large number of witnesses
  e. ☐ Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
  f. ☑ Substantial postjudgment judicial supervision

3.  Remedies sought *(check all that apply):* a. ☑ monetary  b. ☑ nonmonetary; declaratory or injunctive relief  c. ☑ punitive
4.  Number of causes of action *(specify):* **Three**
5.  This case ☑ is  ☐ is not  a class action suit.
6.  If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*
Date: 6/10/2025

Elliot Conn
_____
(TYPE OR PRINT NAME)         ▶ _____
                                (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.   **Page 1 of 2**

| Form Adopted for Mandatory Use<br>Judicial Council of California<br>CM-010 [Rev. January 1, 2024] | **CIVIL CASE COVER SHEET** | Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;<br>Cal. Standards of Judicial Administration, std. 3.10<br>*www.courts.ca.gov* |
|---|---|---|

## INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET                    CM-010

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you **must** complete and file, along with your first paper, the Civil Case Cover Sheet contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check **one** box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the **primary** cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the Civil Case Cover Sheet to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

### CASE TYPES AND EXAMPLES

**Auto Tort**
  Auto (22)–Personal Injury/Property
    Damage/Wrongful Death
    Uninsured Motorist (46) *(if the case involves an uninsured motorist claim subject to arbitration, check this item instead of Auto)*
**Other PI/PD/WD (Personal Injury/ Property Damage/Wrongful Death) Tort**
  Asbestos (04)
    Asbestos Property Damage
    Asbestos Personal Injury/
      Wrongful Death
  Product Liability *(not asbestos or toxic/environmental)* (24)
  Medical Malpractice (45)
    Medical Malpractice–
      Physicians & Surgeons
    Other Professional Health Care
      Malpractice
  Other PI/PD/WD (23)
    Premises Liability (e.g., slip
      and fall)
    Intentional Bodily Injury/PD/WD
      (e.g., assault, vandalism)
    Intentional Infliction of
      Emotional Distress
    Negligent Infliction of
      Emotional Distress
    Other PI/PD/WD
**Non-PI/PD/WD (Other) Tort**
  Business Tort/Unfair Business
    Practice (07)
  Civil Rights (e.g., discrimination,
    false arrest) *(not civil harassment)* (08)
  Defamation (e.g., slander, libel) (13)
  Fraud (16)
  Intellectual Property (19)
  Professional Negligence (25)
    Legal Malpractice
    Other Professional Malpractice
      *(not medical or legal)*
  Other Non-PI/PD/WD Tort (35)
**Employment**
  Wrongful Termination (36)
  Other Employment (15)

**Contract**
  Breach of Contract/Warranty (06)
    Breach of Rental/Lease
      Contract *(not unlawful detainer or wrongful eviction)*
    Contract/Warranty Breach–Seller
      Plaintiff *(not fraud or negligence)*
    Negligent Breach of Contract/
      Warranty
    Other Breach of Contract/Warranty
  Collections (e.g., money owed, open
    book accounts) (09)
    Collection Case–Seller Plaintiff
    Other Promissory Note/Collections Case
  Insurance Coverage *(not provisionally
    complex)* (18)
    Auto Subrogation
    Other Coverage
  Other Contract (37)
    Contractual Fraud
    Other Contract Dispute
**Real Property**
  Eminent Domain/Inverse
    Condemnation (14)
  Wrongful Eviction (33)
  Other Real Property (e.g., quiet title) (26)
    Writ of Possession of Real Property
    Mortgage Foreclosure
    Quiet Title
    Other Real Property *(not eminent domain, landlord/tenant, or foreclosure)*
**Unlawful Detainer**
  Commercial (31)
  Residential (32)
  Drugs (38) *(if the case involves illegal drugs, check this item; otherwise, report as Commercial or Residential)*
**Judicial Review**
  Asset Forfeiture (05)
  Petition Re: Arbitration Award (11)
  Writ of Mandate (02)
    Writ–Administrative Mandamus
    Writ–Mandamus on Limited Court
      Case Matter
    Writ–Other Limited Court Case Review
  Other Judicial Review (39)
    Review of Health Officer Order
    Notice of Appeal–Labor Commissioner
      Appeals

**Provisionally Complex Civil Litigation (Cal. Rules of Court Rules 3.400–3.403)**
    Antitrust/Trade Regulation (03)
    Construction Defect (10)
    Claims Involving Mass Tort (40)
    Securities Litigation (28)
    Environmental/Toxic Tort (30)
    Insurance Coverage Claims
      *(arising from provisionally complex case type listed above)* (41)
**Enforcement of Judgment**
  Enforcement of Judgment (20)
    Abstract of Judgment (Out of County)
  Confession of Judgment *(non-domestic relations)*
  Sister State Judgment
  Administrative Agency Award
    *(not unpaid taxes)*
  Petition/Certification of Entry of
    Judgment on Unpaid Taxes
  Other Enforcement of Judgment Case
**Miscellaneous Civil Complaint**
  RICO (27)
  Other Complaint *(not specified above)* (42)
    Declaratory Relief Only
    Injunctive Relief Only *(non-harassment)*
    Mechanics Lien
    Other Commercial Complaint
      Case *(non-tort/non-complex)*
    Other Civil Complaint
      *(non-tort/non-complex)*
**Miscellaneous Civil Petition**
  Partnership and Corporate
    Governance (21)
  Other Petition *(not specified above)* (43)
    Civil Harassment
    Workplace Violence
    Elder/Dependent Adult Abuse
    Election Contest
    Petition for Name Change
    Petition for Relief From Late Claim
    Other Civil Petition

SUM-100

# SUMMONS
## (CITACION JUDICIAL)

| | |
|---|---|
| **NOTICE TO DEFENDANT:**<br>*(AVISO AL DEMANDADO):*<br>GRANT MONEY, LLC; KIKOFF INC.; and DOES 1-10, inclusive,<br><br>**YOU ARE BEING SUED BY PLAINTIFF:**<br>*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*<br>JOHN REVELL, individually, on behalf of all others similarly situated, and on behalf of the general public, | **FOR COURT USE ONLY**<br>*(SOLO PARA USO DE LA CORTE)* |

NOTICE! You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

| | |
|---|---|
| The name and address of the court is:<br>*(El nombre y dirección de la corte es):*<br>Civic Center Courthouse<br>400 McAllister St.<br>San Francisco CA 94102 | CASE NUMBER:<br>*(Número del Caso):*<br><br>**CGC-25-626107** |

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Elliot Conn Bar No. 279920                    415-417-2780
100 Bush Street, Suite 1580 San Francisco CA 94104

DATE:
*(Fecha)* 06/11/2025          Clerk, by          **SAHAR ENAYATI**          , Deputy
                              *(Secretario)*                              *(Adjunto)*

*(For proof of service of this summons, use* Proof of Service of Summons *(form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario  Proof of Service of Summons, (POS-010)).*

[SEAL]

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*

3. ☐ on behalf of *(specify):*

   under: ☐ CCP 416.10 (corporation)          ☐ CCP 416.60 (minor)
          ☐ CCP 416.20 (defunct corporation)  ☐ CCP 416.70 (conservatee)
          ☐ CCP 416.40 (association or partnership)  ☐ CCP 416.90 (authorized person)
          ☐ other *(specify):*
4. ☐ by personal delivery on *(date):*

Page 1 of 1

| | | |
|---|---|---|
| Form Adopted for Mandatory Use<br>Judicial Council of California<br>SUM-100  [Rev. July 1, 2009] | **SUMMONS** | Code of Civil Procedure §§ 412.20, 465<br>*www.courts.ca.gov* |

# NOTICE TO PLAINTIFF

A Case Management Conference is set for:

**DATE:** **NOV 12, 2025**

**TIME:** **10:30 am**

**PLACE:** **Department 610**
**400 McAllister Street**
**San Francisco, CA  94102-3680**

All parties must appear and comply with Local Rule 3.

CRC 3.725 requires the filing and service of a case management statement form CM-110 no later than 15 days before the case management conference.  However, it would facilitate the issuance of a case management order   **without an appearance**   at the case management conference if the case management statement is filed and served twenty-five days before the case management conference.

Plaintiff must serve a copy of this notice upon each party to this action with the summons and complaint. Proof of service subsequently filed with this court shall so state.   **This case is eligible for electronic filing and service per Local Rule 2.11.  For more information, please visit the Court's website at https://sf.courts.ca.gov under Online Services.**

**[DEFENDANTS: Attending the Case Management Conference does not take the place of filing a written response to the complaint. You must file a written response with the court within the time limit required by law. See Summons.]**

## ALTERNATIVE DISPUTE RESOLUTION REQUIREMENTS

**IT IS THE POLICY OF THE SUPERIOR COURT THAT EVERY CIVIL CASE SHOULD PARTICIPATE IN MEDIATION, ARBITRATION, NEUTRAL EVALUATION,  AN EARLY SETTLEMENT CONFERENCE, OR OTHER APPROPRIATE FORM OF ALTERNATIVE DISPUTE RESOLUTION PRIOR TO A TRIAL.**

(SEE LOCAL RULE 4)

Plaintiff  **must**  serve a copy of the Alternative Dispute Resolution (ADR) Information Package on each defendant along with the complaint.  (CRC 3.221.) The ADR package may be accessed at https://sf.courts.ca.gov/divisions/civil-division/alternative-dispute-resolution or you may request a paper copy from the filing clerk.  All counsel must discuss ADR with clients and opposing counsel and provide clients with a copy of the ADR Information Package prior to filing the Case Management Statement.

**Superior Court Alternative Dispute Resolution Administrator**
**400  McAllister Street, Room 103-A**
**San Francisco, CA  94102**
**adrcoordinator@sftc.org**

**See Local Rules 3.3, 6.0 C and 10 B re stipulation to judge pro tem.**



**Superior Court of California, County of San Francisco
Information Sheet
Voluntary Expedited Jury Trial Summary**

The San Francisco Superior Court encourages the use of Voluntary Expedited Jury Trials ("EJTs") in appropriate cases. EJTs provide an excellent opportunity to resolve your client's case in an expeditious and inexpensive way. Voluntary EJTs are authorized by statute. CCP §§ 630.01.

EJTs can resolve your entire case **or** a single important case critical issue that, once adjudicated, can promote resolution of the entire case (for example: course and scope of employment, causation of an injury, whether a contract was formed, etc.) EJTs promote equal access to civil justice as they are less expensive, consume fewer courtroom days, provide flexibility throughout, encourage high/low agreements to limit risk, and feature streamlined pre-trial procedures.

These are highlights of an EJT (C.C.P. §§ 630.01 et seq. and Rules of Court 3.1549 - 3.1553):

- Parties encouraged to submit a joint jury questionnaire;

- 8 jurors (6 must agree);

- 3 peremptory challenges per side;

- 5-hour time limit per side <u>unless agreed otherwise and approved;</u>

- One to two court days completion <u>unless agreed otherwise and approved;</u>

- Option to present evidence by stipulation and objection;

- High/low arrangement option;

- Limited appeal (misconduct by judge or jury substantially affecting parties' rights or corruption, or bad faith.)

If the parties agree to the Voluntary EJT, they should file and serve the completed and signed (Proposed) Consent Order for Voluntary Expedited Jury Trial, Judicial Council Form EJT-020.

POS-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address)* | FOR COURT USE ONLY |
|---|---|
| Conn Law, PC<br>Elliot Conn SBN 279920<br>100 Bush Street, Suite 1580<br>San Francisco, CA 94104<br>TELEPHONE NO: (415) 417-2780　　FAX NO *(Optional)*:<br>E-MAIL ADDRESS *(Optional)*:　elliot@connlawpc.com<br>ATTORNEY FOR *(Name)*:　Plaintiff | **ELECTRONICALLY**<br>**F I L E D**<br>*Superior Court of California,*<br>*County of San Francisco*<br>**06/20/2025**<br>**Clerk of the Court**<br>**BY: WILMA CORRALES**<br>**Deputy Clerk** |

| SUPERIOR COURT OF CALIFORNIA, COUNTY OF　San Francisco | |
|---|---|
| STREET ADDRESS:　400 McAllister Street<br>MAILING ADDRESS:<br>CITY AND ZIP CODE:　San Francisco, 94102<br>BRANCH NAME:　San Francisco-McAllister | |

| PLAINTIFF / PETITIONER:　John Revell, et al.<br>DEFENDANT / RESPONDENT:　Grant Money, LLC, et al. | CASE NUMBER:<br>CGC-25-626107 |
|---|---|
| **PROOF OF SERVICE OF SUMMONS** | Ref. No. or File No.:<br>13505212 (25586572) |

*(Separate proof of service is required for each party served.)*

1. At the time of service I was at least 18 years of age and not a party to this action.
2. I served copies of:
   a. [X] Summons
   b. [X] Complaint
   c. [X] Alternative Dispute Resolution (ADR) Package
   d. [X] Civil Case Cover Sheet *(served in complex cases only)*
   e. [ ] Cross-Complaint
   f. [X] Other *(specify documents)*:　Notice to Plaintiff
3. a. Party served *(specify name of party as shown on documents served)*:
   GRANT MONEY, LLC
   b. [X] Person (other than the party in item 3a) served on behalf of an entity or as an authorized agent (and not a person under item 5b on whom substituted service was made) *(specify name and relationship to the party named in item 3a)*:
   1505 Corporation URS AGENTS INC. - Ben Rodriguez - Person Authorized to Accept Service of Process
4. Address where the party was served:
   7801 Folsom Blvd #202, Sacramento, CA 95826
5. I served the party *(check proper box)*
   a. [X] **by personal service**. I personally delivered the documents listed in item 2 to the party or person authorized to receive service of process for the party (1) on *(date)*:　Mon, Jun 16 2025　　(2) at *(time)*:　03:52 PM
   b. [ ] **by substituted service**. On *(date)*:　　at *(time)*:　　I left the documents listed in item 2 with or in the presence of *(name and title or relationship to person indicated in item 3)*:

      (1) [ ] **(business)** a person at least 18 years of age apparently in charge at the office or usual place of business of the person to be served. I informed him or her of the general nature of the papers.
      (2) [ ] **(home)** a competent member of the household (at least 18 years of age) at the dwelling house or usual place of abode of the party. I informed him or her of the general nature of the papers.
      (3) [ ] **(physical address unknown)** a person at least 18 years of age apparently in charge at the usual mailing address of the person to be served, other than a United States Postal Service post office box. I informed him or her of the general nature of the papers.
      (4) [ ] I thereafter mailed (by first-class, postage prepaid) copies of the documents to the person to be served at the place where the copies were left (Code Civ. Proc., § 415.20). I mailed the documents on *(date)*:　　from *(city)*:　　or [ ] a declaration of mailing is attached.
      (5) [ ] I attach a **declaration of diligence** stating actions taken first to attempt personal service.

| Form Adopted for Mandatory Use<br>Judicial Council of California<br>POS-010 [Rev. January 1, 2007] | **PROOF OF SERVICE OF SUMMONS** | Page 1 of 2<br>Code of Civil Procedure, § 417.10 |
|---|---|---|

| PLAINTIFF / PETITIONER:    John Revell, et al. | CASE NUMBER: |
|---|---|
| DEFENDANT / RESPONDENT:    Grant Money, LLC, et al. | CGC-25-626107 |

5.  c.  ☐  **by mail and acknowledgment of receipt of service**. I mailed the documents listed in item 2 to the party, to the address shown in item 4, by first-class mail, postage prepaid,

(1)  on *(date)*:                    (2)   from *(city)*:

(3)  ☐  with two copies of the *Notice and Acknowledgment of Receipt* and a postage-paid return envelope addressed to me. *(Attach completed Notice and Acknowledgement of Receipt.)* (Code Civ. Proc., § 415.30.)

(4)  ☐  to an address outside California with return receipt requested. (Code Civ. Proc., § 415.40.)

d.  ☐  **by other means** *(specify means of service and authorizing code section)*:

☐  Additional page describing service is attached.

6.  The "Notice to the Person Served" (on the summons) was completed as follows:

a.  ☐  as an individual defendant.

b.  ☐  as the person sued under the fictitious name of *(specify)*:

c.  ☐  as occupant.

d.  ☒  On behalf of *(specify)*:   GRANT MONEY, LLC

under the following Code of Civil Procedure section:

☐  416.10 (corporation)                   ☐  415.95 (business organization, form unknown)
☐  416.20 (defunct corporation)           ☐  416.60 (minor)
☐  416.30 (joint stock company/association) ☐  416.70 (ward or conservatee)
☐  416.40 (association or partnership)     ☐  416.90 (authorized person)
☐  416.50 (public entity)                 ☐  415.46 (occupant)
☒  other:   Corp. Code 17701.16, LLC

7.  **Person who served papers**

a.  Name:                   Brandon Ortiz

b.  Address:                1400 North McDowell Blvd Suite 300, Petaluma, CA  94954

c.  Telephone number:       800-938-8815

d.  **The fee** for service was:   $50.00

e.  I am:

(1)  ☐  not a registered California process server.

(2)  ☐  exempt from registration under Business and Professions Code section 22350(b).

(3)  ☒  a registered California process server:

(i)  ☐ owner   ☐ employee   ☒ independent contractor

(ii)  Registration No:   2012-037

(iii)  County:   Sacramento

8.  ☒  **I declare** under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

or

9.  ☐  **I am a California sheriff or marshal and** I certify that the foregoing is true and correct.

Date:   June 17, 2025

Brandon Ortiz
_____
(NAME OF PERSON WHO SERVED PAPERS / SHERIFF OR MARSHAL)

InfoTrack US, Inc. - P000634
1400 North McDowell Blvd Suite 300,
Petaluma, CA  94954
800-938-8815

_____
(SIGNATURE)

POS-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address)* | FOR COURT USE ONLY |
|---|---|
| Conn Law, PC<br>Elliot Conn SBN 279920<br>100 Bush Street, Suite 1580<br>San Francisco, CA 94104<br>TELEPHONE NO: (415) 417-2780    FAX NO *(Optional)*:<br>E-MAIL ADDRESS *(Optional)*: elliot@connlawpc.com<br>ATTORNEY FOR *(Name)*: Plaintiff | **ELECTRONICALLY**<br>**F I L E D**<br>*Superior Court of California,*<br>*County of San Francisco*<br>**06/20/2025**<br>**Clerk of the Court**<br>**BY: WILMA CORRALES**<br>**Deputy Clerk** |

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF** San Francisco
STREET ADDRESS: 400 McAllister Street
MAILING ADDRESS:
CITY AND ZIP CODE: San Francisco, 94102
BRANCH NAME: San Francisco-McAllister

| PLAINTIFF / PETITIONER: John Revell, et al.<br>DEFENDANT / RESPONDENT: Grant Money, LLC, et al. | CASE NUMBER:<br>CGC-25-626107 |
|---|---|
| **PROOF OF SERVICE OF SUMMONS** | Ref. No. or File No.:<br>13505211 (25586573) |

*(Separate proof of service is required for each party served.)*

1. At the time of service I was at least 18 years of age and not a party to this action.
2. I served copies of:
   a. **[X]** Summons
   b. **[X]** Complaint
   c. **[X]** Alternative Dispute Resolution (ADR) Package
   d. **[X]** Civil Case Cover Sheet *(served in complex cases only)*
   e. **[ ]** Cross-Complaint
   f. **[X]** Other *(specify documents)*: Notice to Plaintiff
3. a. Party served *(specify name of party as shown on documents served)*:
      KIKOFF INC.
   b. **[X]** Person (other than the party in item 3a) served on behalf of an entity or as an authorized agent (and not a person under item 5b on whom substituted service was made) *(specify name and relationship to the party named in item 3a)*:
      1505 Corporation URS AGENTS INC. - Ben Rodriguez - Person Authorized to Accept Service of Process
4. Address where the party was served:
   7801 Folsom Blvd #202, Sacramento, CA 95826
5. I served the party *(check proper box)*
   a. **[X]** **by personal service**. I personally delivered the documents listed in item 2 to the party or person authorized to receive service of process for the party (1) on *(date)*: Mon, Jun 16 2025    (2) at *(time)*: 03:52 PM
   b. **[ ]** **by substituted service**. On *(date)*:    at *(time)*:    I left the documents listed in item 2 with or in the presence of *(name and title or relationship to person indicated in item 3)*:

      (1) **[ ]** **(business)** a person at least 18 years of age apparently in charge at the office or usual place of business of the person to be served. I informed him or her of the general nature of the papers.
      (2) **[ ]** **(home)** a competent member of the household (at least 18 years of age) at the dwelling house or usual place of abode of the party. I informed him or her of the general nature of the papers.
      (3) **[ ]** **(physical address unknown)** a person at least 18 years of age apparently in charge at the usual mailing address of the person to be served, other than a United States Postal Service post office box. I informed him or her of the general nature of the papers.
      (4) **[ ]** I thereafter mailed (by first-class, postage prepaid) copies of the documents to the person to be served at the place where the copies were left (Code Civ. Proc., § 415.20). I mailed the documents on *(date)*:
         from *(city)*:    or **[ ]** a declaration of mailing is attached.
      (5) **[ ]** I attach a **declaration of diligence** stating actions taken first to attempt personal service.

| Form Adopted for Mandatory Use<br>Judicial Council of California<br>POS-010 [Rev. January 1, 2007] | **PROOF OF SERVICE OF SUMMONS** | Page 1 of 2<br>Code of Civil Procedure, § 417.10 |
|---|---|---|

| | |
|---|---|
| PLAINTIFF / PETITIONER:    John Revell, et al.<br>DEFENDANT / RESPONDENT:    Grant Money, LLC, et al. | CASE NUMBER:<br>CGC-25-626107 |

5.  c.  ☐  **by mail and acknowledgment of receipt of service**. I mailed the documents listed in item 2 to the party, to the address shown in item 4, by first-class mail, postage prepaid,
   (1)  on *(date)*:                                    (2)  from *(city)*:
   (3)  ☐  with two copies of the *Notice and Acknowledgment of Receipt* and a postage-paid return envelope addressed to me. *(Attach completed Notice and Acknowledgement of Receipt.)* (Code Civ. Proc., § 415.30.)
   (4)  ☐  to an address outside California with return receipt requested. (Code Civ. Proc., § 415.40.)
   d.  ☐  **by other means** *(specify means of service and authorizing code section)*:

   ☐  Additional page describing service is attached.

6.  The "Notice to the Person Served" (on the summons) was completed as follows:
   a.  ☐  as an individual defendant.
   b.  ☐  as the person sued under the fictitious name of *(specify)*:
   c.  ☐  as occupant.
   d.  ☒  On behalf of *(specify)*:    KIKOFF INC.
      under the following Code of Civil Procedure section:
      ☒  416.10 (corporation)                    ☐  415.95 (business organization, form unknown)
      ☐  416.20 (defunct corporation)            ☐  416.60 (minor)
      ☐  416.30 (joint stock company/association) ☐  416.70 (ward or conservatee)
      ☐  416.40 (association or partnership)      ☐  416.90 (authorized person)
      ☐  416.50 (public entity)                  ☐  415.46 (occupant)
      ☐  other:

7.  **Person who served papers**
   a.  Name:                    Brandon Ortiz
   b.  Address:                 1400 North McDowell Blvd Suite 300, Petaluma, CA  94954
   c.  Telephone number:        800-938-8815
   d.  **The fee** for service was:  $85.50
   e.  I am:
      (1)  ☐  not a registered California process server.
      (2)  ☐  exempt from registration under Business and Professions Code section 22350(b).
      (3)  ☒  a registered California process server:
         (i)  ☐ owner    ☐ employee    ☒ independent contractor
         (ii)  Registration No:   2012-037
         (iii)  County:   Sacramento

8.  ☒  **I declare** under penalty of perjury under the laws of the State of California that the foregoing is true and correct.
      or
9.  ☐  **I am a California sheriff or marshal and** I certify that the foregoing is true and correct.

Date:   June 17, 2025

Brandon Ortiz
_____
   (NAME OF PERSON WHO SERVED PAPERS / SHERIFF OR MARSHAL)

InfoTrack US, Inc. - P000634
1400 North McDowell Blvd Suite 300,
Petaluma, CA  94954
800-938-8815

_____
                              (SIGNATURE)