**CONN LAW, PC**
Elliot Conn Bar No. 279920
elliot@connlawpc.com
100 Bush Street, Suite 1580
San Francisco, CA 94104
Telephone: (415) 417-2780
Facsimile: (415) 358-4941

**CARNEY BATES & PULLIAM, PLLC**
Randall K. Pulliam (*pro hac vice*)
rpulliam@cbplaw.com
Lee Lowther (*pro hac vice*)
llowther@cbplaw.com
Courtney Ross Brown (*pro hac vice*)
cbrown@cbplaw.com
One Allied Drive, Suite 1400
Little Rock, AR, 72202
Telephone: (501) 312-8500

**JACOBSON PHILLIPS PLLC**
Joshua R. Jacobson (*pro hac vice*)
joshua@jacobsonphillips.com
2277 Lee Road, Ste. B
Winter Park, FL 32789
Telephone: (321) 447-6461
Attorneys for Plaintiff John Revell and
the Proposed Classes

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| JOHN REVELL, individually, on behalf of all others similarly situated, and on behalf of the general public,<br><br>                  Plaintiff,<br><br>     v.<br><br>GRANT MONEY, LLC; KICKOFF INC.,<br><br>                  Defendants. | Case No.: 3:25-cv-05994-TLT<br><br>**RESPONSE IN OPPOSITION TO MOTION TO STAY CLAIMS IN FAVOR OF ARBITRATION, OR FOR ALTERNATIVE RELIEF**<br><br>Judge: Hon. Trina L. Thompson<br><br>Complaint Filed: June 10, 2025<br><br>Trial Date: Not Set |

## **TABLE OF CONTENTS**

I.     Introduction ........................................................................................................... 1

II.    Factual Background ............................................................................................... 2

III.   Statutory Background ............................................................................................ 5

IV.    Legal Standard ...................................................................................................... 6

V.     Argument ............................................................................................................... 6

   A. The MLA Prohibits Arbitration ........................................................................ 6

     i.    The MLA Overrides the FAA and Forecloses Arbitration of Claims Involving Consumer Credit Agreements with Plaintiff. ................................................. 7

   B. The MLA Applies to Defendants' Cash Advances. ........................................... 8

     i.    Grant's Cash Advance product clearly falls within the statutory definition of consumer credit. .......................................................................................... 8

     ii.   The purported "non-recourse" nature of Grant Cash Advance transactions does not preclude their treatment as consumer credit. .....................................11

     iii.  Defendants' Expedited Delivery Fees and subscription fees are finance charges ... 13

        i.    Expedited Delivery Fees are finance charges under the MLA and Regulation Z ................................................................................ 13

        ii.   Subscription Fees charged in connection with Grant's Cash Advances are finance charges pursuant to the MLA's definition of interest .......................... 16

        iii.  Defendants' arguments do not change the above analysis ............................... 17

          1. It is irrelevant that Defendants' characterize some charges as optional ........ 17

          2. The terminated CFPB Order Cited by Defendants is off-point. ................... 20

          3. Regulations about credit cards do not apply to this case ............................... 20

     iv.   Plaintiff's TILA and GPLA claims may not be arbitrated ........................ 20

     v.    Defendants' Class Action Waiver is Unenforceable Against Plaintiff .................... 21

VI.    CONCLUSION ..................................................................................................... 22

# TABLE OF AUTHORITIES

**Cases**

*Alexander v. Carrington Mortg. Servs., LLC,*
   23 F.4th 370 (4th Cir. 2022) .................................................... 15

*Arrington v. Colleen, Inc.*,
   2001 WL 3411735 (D. Md. Mar. 29, 2001) ............................. 11

*Beach v. Ocwen Fed. Bank*,
   523 U.S. 410 (1998) ................................................................. 6

*Burnett v. Ala Moana Pawn Shop*,
   3 F.3d 1261 (9th Cir. 1993) ..................................................... 12

*Cal. Pawnbrokers Ass'n v. Carter*,
   2016 WL 6599819 (E.D. Cal. Nov. 7, 2016)............................ 13

*CFPB v. MoneyLion Techs. Inc.*,
   2025 WL 893684 (S.D.N.Y. Mar. 24, 2025) ..................... 6, 8, 17

*Cox v. Cmty. Loans of Am., Inc.,*
   2012 WL 773496 (M.D. Ga. Mar. 8, 2012)................................10

*Davenport v. Litton Loan Servicing, LP,*
   725 F. Supp. 2d 862 (N.D. Cal. 2010) ....................................... 5

*Davis v. Pac. Capital Bank,*
   550 F.3d 915 (9th Cir. 2008) .................................................... 16

*Digital Realty Tr., Inc. v. Somers*,
   583 U.S. 149 (2018) .................................................................. 16

*Edwards v. Your Credit Inc.*,
   148 F.3d 427 (5th Cir. 1998) .................................................... 12

*Epic Sys. Corp. v. Lewis,*
   584 U.S. 497 (2018) ...................................................................6

*Fin. Freedom Acquisition, LLC v. Std. Bank & Tr. Co.*,
   2015 IL 117950, 43 N.E.3d 911, 918 (Ill. 2015) ..................... 13

*Fuentes v. AR Resources, Inc.*,
   2017 WL 1197814 (D.N.J. 2017) ........................................................................ 16

*Genesco, Inc. v. T. Kakiuchi & Co.*,
   815 F.2d 840 (2d Cir. 1987) ................................................................................ 6

*Glover v. Ocwen Loan Servicing, LLC*,
   127 F.4th 1278 (11th Cir. 2025) ......................................................................... 15

*Golubiewski v. Activehours, Inc.*,
   2024 WL 4204272 (M.D. Pa. Sept. 16, 2024) ..................................................... 15

*Golubiewski v. Activehours, Inc.*,
   2025 WL 2484192 (M.D. Pa. Aug. 28, 2025) ........................................ 2, 10, 14, 18

*Hamilton v. York*,
   987 F. Supp. 953 (E.D. Ky. 1997) ....................................................................... 11

*Household Credit Servs., Inc. v. Pfennig*,
   541 U.S. 232 (2004) ............................................................................................ 14

*Johnson v. Activehours, Inc.*,
   2025 WL 2299425 (D. Md. Aug. 8, 2025) ..................................................... passim

*Lembeck v. Arvest Cent. Mortg. Co.*,
   498 F. Supp. 3d 1134 (N.D. Cal. 2020) ............................................................... 16

*Loughrin v. United States*,
   573 U.S. 351 (2014) ............................................................................................ 18

*Miller v. HLT Check Exchange (In re Miller)*,
   215 B.R. 970 (E.D. Ky. Bkr. 1997) ..................................................................... 11

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth*,
   473 U.S. 614 (1985) ............................................................................................. 7

*New Prime Inc. v. Olivera*,
   586 U.S. 105 (2019) ............................................................................................. 8

*Orubo v. Activehours, Inc.*,
   780 F. Supp. 3d 927 (N.D. Cal. 2025) .......................................................... passim

*Quinteros v. MBI Associates, Inc.*,
   999 F. Supp. 2d 434 (E.D.N.Y. 2014) ................................................................. 16

*Rent-A-Center, W., Inc. v. Jackson*,
  561 U.S. 63 (2010) ................................................................................ 7

*Shearson/Am. Exp., Inc. v. McMahon*,
  482 U.S. 220 (1987) .............................................................................. 7

*Steines v. Westgate Palace, L.L.C.*,
  113 F.4th 1335 (11th Cir. 2024)..................................................... passim

*Turner v. E-Z Check Cashing, Inc.*,
  35 F. Supp. 2d 1042 (M.D. Tenn. 1999)............................................... 10

*United States v. Wenner*,
  351 F.3d 969 (9th Cir. 2003) ............................................................... 18

*Veale v. Citibank, F.S.B.*,
  85 F.3d 577 (11th Cir. 1996) ............................................................... 19

*Vimar Seguros y Reaseguros, S. A. v. M/V Sky Reefer*,
  515 U. S. 528 (1995) ............................................................................. 7

*Williams v. Chartwell Fin. Servs., Ltd.*,
  204 F.3d 748 (7th Cir. 2000) ............................................................... 12

*Williams v. PHH Mortg. Corp.*,
  2021 WL 3556633 (S.D. Tex. Aug. 11, 2021) .................................... 16

**Statutes**
10 U.S.C. § 987(a) ............................................................................ 5, 9
10 U.S.C. § 987(b) ................................................................................ 5
10 U.S.C. § 987(d)(1) .......................................................................... 16
10 U.S.C. § 987(e)(2) .......................................................................... 22
10 U.S.C. § 987(e)(3) ............................................................................ 8
10 U.S.C. § 987(f)(4)................................................................. 1, 6, 7, 22
10 U.S.C. § 987(i)(3) ........................................................................... 16
10 U.S.C. §§ 987(f)(3) ......................................................................... 21
12 C.F.R. § 1026.4(a) .......................................................................... 14
12 C.F.R. § 226.4(b)(1) ....................................................................... 16
15 U.S.C. § 1601 .................................................................................. 1
15 U.S.C. § 1601(a) ............................................................................... 6
15 U.S.C. § 1602(f) ............................................................................... 9
15 U.S.C. § 1602(g)(1) .......................................................................... 6

15 U.S.C. § 1605(a) .................................................................................................... 14
15 U.S.C. §1605(a) ..................................................................................................... 14
32 C.F.R. § 232.3(f) .................................................................................................... 14
32 C.F.R. § 232.3(h) ............................................................................................... 9, 10
32 C.F.R. § 232.4(c)(1)(iii)(C) ................................................................................... 17
32 C.F.R. § 232.8 .......................................................................................................... 5

**Other Authorities**

Consumer Financial Protection Bureau, *Payday Loans and Deposit Advance Products* 24-25
   (April 2013) ............................................................................................................. 11
*Nonrecourse*, BLACK'S LAW DICTIONARY (11th ed. 2019) .......................................... 13
U.S. DEP'T OF DEF., *Rep. on Predatory Lending Practices Directed at Members of the Armed
   Forces and Their Dependents* (Aug. 9, 2006) ............................................................. 1

**Rules**

Fed. R. Civ. P. 12(b)(6) .............................................................................................. 17

**Regulations**

61 Fed. Reg. 49237 ...................................................................................................... 19
61 Fed. Reg. 49239 ................................................................................................ 18, 19
80 Fed. Reg. 43560 ...................................................................................................... 11
80 Fed. Reg. 43561 ...................................................................................................... 11
80 Fed. Reg. 43579 ...................................................................................................... 11
80 Fed. Reg. 43580 ...................................................................................................... 11

## I.    Introduction

The Military Lending Act was enacted in 2006 after a Department of Defense report found high interest loans targeting active-duty servicemembers are "a source of considerable collateral damage" to the military and its servicemembers.[1] The MLA was specifically enacted to curb predatory payday lenders that make short-term, high-cost loans that harm military personnel. Class Action Complaint, ECF No. 1-2 ("Compl."), ¶¶ 19–27.

Defendants, Grant Money, LLC and Kickoff Inc. ("Grant" or "Defendants") are high-tech payday lenders. Grant is a financial technology ("fintech") company that offers an "earned wage access" (EWA) product called "Cash Advance." Through this product, Grant offers credit to its users to sustain themselves between paydays. Compl., ¶¶ 46–47. Grant sends users cash advances via electronic transfer to their bank accounts. It collects repayment of loan principal plus fees via a preauthorized debit scheduled for the borrower's next payday. *Id.* ¶¶ 89.

Plaintiff—John Revell, a Staff Sergeant in the U.S. Army ("Plaintiff" or "SSgt. Revell")—brings this action to vindicate his and similarly situated individuals' rights under the Military Lending Act ("MLA"), Truth in Lending Act ("TILA"), and Georgia Payday Lending Act ("PLA") arising from Grant's payday loan product. Grant's loans violate these laws by, *inter alia*, charging interest far exceeding the MLA's and PLA's usury caps and omitting mandatory credit disclosures.

Congress has made clear that claims involving credit agreements to servicemembers cannot be shunted to arbitration. Even assuming Plaintiff agreed to an arbitration agreement that would be enforceable if he were not a servicemember, that is of no import because the MLA specifically prohibits arbitration of "any dispute" involving the extension of consumer credit to servicemembers (like SSgt. Revell) and their dependents. *See, e.g.*, 10 U.S.C. § 987(f)(4).[2] Each court to address the arbitrability of MLA claims has held the MLA displaces the Federal

---

[1] U.S. DEP'T OF DEF., *Rep. on Predatory Lending Practices Directed at Members of the Armed Forces and Their Dependents*, at 39 (Aug. 9, 2006), https://apps.dtic.mil/sti/pdfs/ADA521462.pdf [https://perma.cc/NAC5-D97H] ("DoD Report").

[2] In pertinent part, the MLA provides, "Notwithstanding section 2 of title 9, or any other Federal or State law, rule, or regulation, no agreement to arbitrate any dispute involving the extension of consumer credit shall be enforceable against any covered member or dependent of such a member, or any person who was a covered member or dependent of that member when the agreement was made."

OPP. TO MOT. TO STAY IN FAVOR OF ARBITRATION – CASE NO: 3:25-cv-05994-TLT -1

Arbitration Act with respect to consumer credit transactions with active military and their dependents. *See, e.g.*, *Steines v. Westgate Palace, L.L.C.*, 113 F.4th 1335, 1343 (11th Cir. 2024) ("Two separate clauses of the MLA establish Congress's clear intent to prohibit lenders of consumer credit from requiring servicemembers to arbitrate claims arising therefrom. The MLA entirely displaces the FAA.").

Because the Cash Advances extended to SSgt. Revell constitute "consumer credit" covered by the MLA, arbitration of "any dispute" is forbidden. Nevertheless, Grant moves to compel arbitration and strike class claims, devoting much of its brief to an academic discussion of general arbitration principles and contract formation issues that Congress expressly supplanted when it enacted the MLA. In so moving, Grant backtracks on the numerous admissions baked into its terms and conditions that Cash Advance is a "credit" and "loan" product and makes a form-over-substance argument that its Cash Advances are not credit. This will not do. Applying the prescribed statutory definitions, interpretive guidance of Regulation Z, and caselaw addressing materially similar cash advance services, Cash Advance transactions plainly constitute consumer credit. This conclusion is consistent with *three* recent opinions holding that a materially identical EWA product "squarely falls within the definition of credit under TILA" and, by extension, the MLA.[3] *See Orubo v. Activehours, Inc.*, 780 F. Supp. 3d 927, 935 (N.D. Cal. Apr. 30, 2025); *Johnson v. Activehours, Inc.,* No. 1:24-CV-02283-JRR, 2025 WL 2299425, at *8 (D. Md. Aug. 8, 2025), *Golubiewski v. Activehours, Inc.*, No. 3:22-CV-02078, 2025 WL 2484192, at *6 (M.D. Pa. Aug. 28, 2025). The Motion should be denied.

## II.    Factual Background

Through its smartphone-based application, Grant[4] issues short-term cash advances to borrowers. Compl. ¶¶ 46–47. Grant advertises its product as free, no interest, or low cost while

---

[3] As discussed *infra*, the MLA borrows the TILA's statutory definition of "consumer credit."

[4] Defendants proffer an attorney declaration in support of their motion stating the Grant app, which Defendants operate, was previously "known as 'Oasis,' [but] has since been rebranded to 'Grant.'" ECF No. 31-1, ¶ 6. Because the rebrand is irrelevant to the outcome of Defendants' Motion—Defendants concede they have operated the payday loan app throughout the relevant period and do not identify any material differences affecting the below analysis—this brief refers to the current, operative "Grant" app and product that Plaintiff used as alleged in the Complaint.

OPP. TO MOT. TO STAY IN FAVOR OF ARBITRATION – CASE NO: 3:25-cv-05994-TLT -2

obscuring how it bilks customers for fees and other finance charges that add up to loan-shark interest rates. *Id.* ¶¶ 50, 56.

Borrowers like SSgt. Revell must download the Grant app and create an account to request Cash Advances. *Id.* ¶¶ 47–49, 70–71. Before advancing funds, Grant performs extensive underwriting by directly accessing borrowers' bank account data to assess their financial health, liquidity, and anticipated income. *Id.* ¶¶ 70–92.[5]

Borrowers must satisfy a litany of criteria proving their creditworthiness and set up automated repayment to receive a cash advance. *Id.* ¶¶ 72–78. To do so, borrowers must link their bank account to the Grant app, supply a debit card, and pre-authorize Grant to debit their linked accounts on the scheduled repayment date. *Id.* ¶¶ 72–73, 83. In the process, Grant confirms its borrowers who take an advance owe money and are obligated to pay it back. Specifically, Grant requires borrowers taking an advance to agree that "I accept this advance and authorize the repayment of the total amount shown as described above." *Id.* ¶ 83. Additionally, Grant shows borrowers screens indicating the "Payback amount" due on repayment, identifying the "repayment date," and indicating borrowers who have taken a Cash Advance "agreed to pay the amount [] back on" the repayment date. *Id.* ¶ 84 & fig. 5.

In the terms and conditions attached to Defendants' motion, Defendants repeatedly make reference to its Cash Advance product as "credit" and a "loan." ECF No. 31-1, at 12 (discussing borrowers' "loan pre-registration and application" and reserving Grant's "right to decline your application for a loan or other product"), 24 (discussing "termination of [borrowers'] credit privileges"). Indeed, before the "Grant" rebrand, Defendants used a "cash-advance-support@oasiscredit.com" email for communications with borrowers. *Id.* at 10. Defendants also required that Plaintiff authorize them to access Plaintiff's credit score and report information from the major credit bureaus. *Id.* at 12.

The Grant app automatically schedules the repayment for the borrower's next payday. *Id.* ¶ 85. Failure to repay Grant Cash Advance loans results in Grant preventing the borrower from

---

[5] Grant constantly monitors its customers' financial health and continually adjusts customers' eligibility to receive cash based on their default risk to ensure repayment. *Id.* ¶¶ 70–77.

using the product—which cash-strapped customers are usually *dependent on*—until the loan is repaid. *Id.* ¶ 90. Further, users cannot disconnect their connected bank account or disconnect a debit card from the Grant app while a Cash Advance is outstanding—meaning Grant deprives users of a mechanism to cancel the subscription fee through the app until all prior advances have been paid. *Id.* Through its underwriting and collections processes, Grant collects approximately 97% or more of the money it lends. *Id.* ¶ 92.

Grant makes money through two types of fees: (1) expedite fees and (2) mandatory subscription fees. *Id.* ¶ 51. Expedite fees ("Expedited Delivery Fees") are paid to provide instant access to loaned funds. *Id.* ¶ 52. Grant charges between $2.00 and $8.00 for Expedited Delivery Fees, notwithstanding that its cost to provide cash instantly is less than $0.05. *Id.* ¶¶ 53–54. As with traditional interest, the cost of Grant's loans increase with the loan's size (*i.e.*, the Expedited Delivery Fee goes up with the size of the loan). *Id.* ¶ 53. Grant encourages borrowers to use the expedited delivery feature and has cultivated a customer base that is dependent on instant cash. *Id.* ¶ 55–56. Specifically, Grant's advertisements emphasize Cash Advances offer cash "at your fingertips," "today," "Get Cash Fast," and "instantly." *Id.* ¶ 56. And according to Grant, the non-expedited version of Cash Advance will take "3–5 days" to clear. *Id.* ¶ 57. Such a lengthy delay (30–50% or more of the loan term) is problematic for Grant's user base—individuals living paycheck to paycheck and who need "cash fast" to cover "unexpected expenses" and sustain themselves between paydays. *Id.* ¶¶ 55–57. Grant exploits its customers' urgent need for cash fast by reliably extracting Expedited Delivery Fees from borrowers, aided by the remarkably short loan term for EWA payday advances, which a recent study found "was only 10.3 days." *Id.* ¶ 58.

The annual percentage rate (APR) on these finance charges is breathtaking. SSgt. Revell received Cash Advances while on active duty, which carried APRs between 608% and 1944%. *Id.* ¶ 98.

Recent studies have confirmed EWA products like Grant's worsen the financial health of users—with one finding EWA products fostered dependence and rampant repeat borrowing, and another finding overdrafts on checking accounts "increased 56% on average after use of an advance product." *Id.* ¶¶ 68–69. Indeed, Grant's short-term high-cost loan product inflicts the

OPP. TO MOT. TO STAY IN FAVOR OF ARBITRATION – CASE NO: 3:25-cv-05994-TLT -4

exact harms the MLA was enacted to prevent. *Compare id. with* DoD Report, at p. 3 (predatory lending products "strip earnings or savings from the borrower; place the borrower's key assets at undue risk; do not help the borrower resolve their financial shortfall; trap the borrower in a cycle of debt; and leave the borrower in worse financial shape than when they initially contacted the lender").

Ironically, Grant promotes its product as a low-cost payday loan alternative. *Id.* ¶ 65. In truth, Grant is a wolf in sheep's clothing: extending loans with APRs *exceeding* the exorbitantly priced payday loan products it claims to replace.

## III. Statutory Background

In 2006, the Department of Defense published its Report on predatory lending practices affecting the military—with a special emphasis on payday loans—finding "[p]redatory lending undermines military readiness, harms the morale of troops and their families, and adds to the cost of fielding an all volunteer fighting force." DoD Report, at 53.

Enacted in response to this report, the MLA protects servicemembers and their dependents by, among other things, making it illegal for creditors to "impose an annual percentage rate of interest greater than 36 percent with respect to the consumer credit extended to" those persons. 10 U.S.C. § 987(b); *see* DoD Report at 7. The MLA applies to "covered members"—which include members of the armed forces on active duty and on active Guard and Reserve Duty—and their dependents. 10 U.S.C. §§ 987(a), (i)(1), (2). The MLA's implementing regulations specify that it applies to entities, like Defendant, engaged in "payday loan transactions." 32 C.F.R. § 232.8(a). Yet Defendants issue payday loan transactions with military APR charges far exceeding the MLA's usury cap.

"Congress enacted TILA to promote 'the informed use of credit' by consumers." *Davenport v. Litton Loan Servicing, LP*, 725 F. Supp. 2d 862, 872 (N.D. Cal. 2010) (quoting 15 U.S.C. § 1601(a)). TILA was designed to "assure a meaningful disclosure of credit terms" to facilitate informed decisions by consumers and guard against unfair credit practices. *Beach v. Ocwen Fed. Bank*, 523 U.S. 410, 412 (1998) (quoting 15 U.S.C. § 1601(a)). TILA's disclosure

requirements apply to creditors that regularly extend credit subject to a "finance charge." 15 U.S.C. § 1602(g)(1).

Grant provides no such disclosures.

## IV.   Legal Standard

If the MLA applies, a court may not compel arbitration. *See Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 504, (2018); *Steines*, 113 F.4th at 1343 ("The statutory text of the MLA couldn't be clearer that where the MLA applies, the FAA does not.").[6] The text of the MLA confirms this by prohibiting enforcement of "agreement[s] to arbitrate any dispute involving the extension of consumer credit" to covered members—so if Plaintiff's complaint shows a "dispute involving the extension of consumer credit" to covered members, arbitration may not be compelled. See 10 U.S.C. § 987(f)(4).

## V.   Argument

### A.   The MLA Prohibits Arbitration

The MLA's text prohibiting arbitration "couldn't be clearer," and yet Grant seeks to compel Plaintiff's meritorious MLA and related claims to arbitration. *Steines*, 113 F.4th at 1343; *see also, e.g.*, *CFPB v. MoneyLion Techs. Inc.*, No. 22-cv-8308, 2025 WL 893684, at *24 (S.D.N.Y. Mar. 24, 2025) ("Section 987(f)(4) [of the MLA] independently renders all arbitration agreements unenforceable as against military borrowers."). Grant's brief spends pages arguing contract formation principles, more pages emphasizing the FAA generally favors arbitration, and more pages still attacking a phantom unconscionability argument. This curious argument ignores one of the MLA's defining features: its arbitration ban. Indeed, the Supreme Court has cited the MLA as the paradigmatic example of a federal statute that clearly "displaces the FAA altogether." *Epic Sys.*, 584 U.S. at 504.

Because Grant's Cash Advances with SSgt. Revell—a Covered Member under the MLA—involve the extension of consumer credit, the MLA applies and precludes arbitration.

---

[6] In adjudicating motions to compel arbitration, "if federal statutory claims are asserted," the court must determine "whether Congress intended those claims to be nonarbitrable." *Genesco, Inc. v. T. Kakiuchi & Co.*, 815 F.2d 840, 844 (2d Cir. 1987).

1

        ***i.***      ***The MLA Overrides the FAA and Forecloses Arbitration of Claims***

2

                ***Involving Consumer Credit Agreements with Plaintiff.***

3          The FAA generally requires enforcement of arbitration agreements, however "[l]ike any

4  statutory directive, the Arbitration Act's mandate may be overridden by a contrary congressional

5  command." *Shearson/Am. Exp., Inc. v. McMahon*, 482 U.S. 220, 226–27 (1987). Thus, where a

6  party seeks to enforce an arbitration agreement, a party resisting arbitration "should be held to it

7  ***unless*** Congress itself has evinced an intention to preclude a waiver of judicial remedies for the

8  statutory rights at issue." *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth*, 473 U.S. 614, 628

9  (1985) (emphasis added). The party arguing the FAA has been displaced must demonstrate "'a

10  clearly expressed congressional intention' that such a result should follow." *Epic Sys.*, 584 U.S.

11  at 510 (quoting *Vimar Seguros y Reaseguros, S. A. v. M/V Sky Reefer*, 515 U. S. 528, 533 (1995)).

12  The Supreme Court has held that "[i]f a party challenges validity under [FAA] § 2 of the precise

13  agreement to arbitrate at issue, the federal court must consider the challenge *before* ordering

14  compliance with the agreement under § 4." *Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63, 71

15  (2010) (emphasis added).

16          Relevant here, the MLA evinces an unmistakable congressional intent to override the FAA

17  in the context of consumer credit agreements with covered servicemembers and their dependents.

18  As the Eleventh Circuit recently held on precisely this issue, two "separate clauses of the MLA

19  establish Congress's clear intent to prohibit lenders of consumer credit from requiring

20  servicemembers to arbitrate claims arising therefrom." *Steines*, 113 F. 4th at 1343.

21       ***First***, the MLA explicitly declares that it overrides the FAA: "Notwithstanding section 2

22  of title 9 [i.e., the FAA], or any other Federal or State law, rule, or regulation, no agreement to

23  arbitrate any dispute involving the extension of consumer credit shall be enforceable against any

24  covered member." 10 U.S.C. § 987(f)(4). Thus, "[i]f the MLA applies to a contract involving the

25  extension of consumer credit, the district court cannot enforce any agreement in that contract to

26  arbitrate any dispute." *Steines*, 113 F. 4th at 1344. ***Second***, § 987(e)(3) provides "[i]t shall be

27  unlawful for any creditor to extend consumer credit" to a servicemember where "the creditor

28  requires the borrower to submit to arbitration[.]"

OPP. TO MOT. TO STAY IN FAVOR OF ARBITRATION – CASE NO: 3:25-cv-05994-TLT -7

Considering the statute's plain text, the Supreme Court has pointed to the MLA as a textbook example of Congress overriding the FAA. *Epic Sys.*, 584 U.S. at 514 ("Congress has . . . shown that it knows how to override the Arbitration Act when it wishes—by explaining, for example, that . . . requiring a party to arbitrate is 'unlawful' [], 10 U.S.C. § 987(e)(3)."). Following the Court's lead, lower courts have repeatedly held the "MLA entirely displaces the FAA." *See, e.g.*, *Steines*, 113 F. 4th at 1343; *MoneyLion Techs. Inc.*, 2025 WL 893684, at *24 (similar); *Cox v. Cmty. Loans of Am., Inc.,* No. 4:11-CV-177 CDL, 2012 WL 773496, at *5 (M.D. Ga. Mar. 8, 2012)  (same).

Accordingly, Plaintiff has met his burden of showing Congress's clear intent to prohibit lenders from requiring covered servicemembers to arbitrate claims arising from consumer credit agreements. *See also generally* 10 U.S.C. § 987; *MoneyLion*, 2025 WL 893684, at *24 ("Section 987(f)(4) [of the MLA] independently renders all arbitration agreements unenforceable as against military borrowers, guaranteeing that military borrowers who commence legal action will still have their day in court").[7]

### B.    The MLA Applies to Defendants' Cash Advances.

The MLA applies to: (1) consumer credit agreements that are (2) subject to a finance charge and (3) between covered borrowers and creditors. Defendants argue that the MLA does not apply because the Cash Advances are not consumer credit subject to a "finance charge." Settled law is to the contrary. Grant erroneously argues that the purported "non-recourse" nature of its loans creates no obligation to repay the loans, thus precluding the loans from being treated as credit and that its Expedited Delivery Fees and subscription charges are not finance charges as a matter of law. Grant is mistaken as to both arguments.

> ### i.    *Grant's Cash Advance product clearly falls within the statutory definition of consumer credit.*

---

[7] Any argument that the threshold question of arbitrability has been delegated to the arbitrator would fail. *See Steines*, 113 F. 4th at 1341–43 (holding the threshold question of whether the MLA overrode the FAA with respect to a particular arbitration agreement "cannot be delegated to an arbitrator"); *accord New Prime Inc. v. Olivera*, 586 U.S. 105, 112 (2019) ("A delegation clause is merely a specialized type of arbitration agreement, and the Act operates on this additional arbitration agreement just as it does on any other.") (citation omitted).

Grant's Cash Advance product falls squarely within the MLA's definition of consumer credit. The MLA applies to the "extension of consumer credit" to "covered members" and their dependents. 10 U.S.C. § 987(a). The MLA adopts the definition of consumer credit provided by regulation. *Id.* § 987(i)(6). In turn, the MLA's implementing regulations define "consumer credit" as "credit offered or extended to a covered borrower primarily for personal, family, or household purposes, and that is: (i) subject to a finance charge; or (ii) payable by a written agreement in more than four installments." 32 C.F.R. § 232.3(f)(1).

 "Credit" is defined as "the right granted to a consumer by a creditor to defer payment of debt or to incur debt and defer its payment." 32 C.F.R. § 232.3(h). The TILA applies a substantially identical "credit" definition. *Compare* 32 C.F.R. § 232.3(h) *with* 15 U.S.C. § 1602(f). And the official commentary to Regulation Z explains that "[c]redit includes a transaction in which a cash advance is made to a consumer … in exchange for the consumer's authorization to debit the consumer's deposit account, and where the parties agree… that the consumer's deposit account will not be debited, until a designated future date." 12 C.F.R. pt. 1026, Supp. I, Paragraph 2(a)(14) Credit, para. 2.[8]

Finally, "debt" is defined as a "[l]iability on a claim; a specific sum of money due by agreement or otherwise." *Debt*, BLACK'S LAW DICTIONARY (10th ed. 2014). The ordinary meaning of "debt" is "something owed; obligation," or "a state of being under obligation to pay or repay someone or something in return for something received; a state of owing." *Debt*, MERRIAM-WEBSTER, https://www.merriamwebster.com/dictionary/debt.

Defendants' Cash Advance transactions allowed Plaintiff to "defer payment of debt or to incur debt and defer its payment," thereby constituting consumer credit. See 32 C.F.R. § 232.3(h). Grant advanced money in exchange for a promise to repay (backed by mandatory pre-authorized debits to linked bank accounts) a specific amount due on a specific date. Compl. ¶¶ 2–4, 82–85.

---

[8] Grant unpersuasively argues this Regulation Z commentary was "never intended to apply to transactions without an obligation to repay." ECF No. 31, at 15. This argument omits that Grant borrowers are obligated to repay Cash Advances they take, and Grant enforces this obligation with pre-authorized debits. To the extent Grant is arguing that the Regulation Z commentary "presupposes" a legal obligation invariably enforceable in court, Grant is wrong. The Federal Reserve Board's commentary clarifies that a "legal obligation" may encompass an obligation "deemed unenforceable." 12 C.F.R. pt. 1026, Supp. I, ¶ 5(c)(1)(ii). *Legal enforceability* is therefore not mandatory to constitute credit under Regulation Z.

Plaintiff is *obligated* to repay the advances, including all associated fees, on his next payday. *Id.* ¶¶ 85–88. This is "the precise type" of cash advance transaction that *three courts* have held constitute credit under the definition applicable here. *See Orubo*, 780 F. Supp. 3d at 935; *Johnson*, 2025 WL 2299425, at \*8; *Golubiewski*, 2025 WL 2484192, at \*6.

In *Orubo*, the Northern District of California held an EWA product materially identical to Grant Cash Advance constituted credit under materially identical law. This analysis applies equally here: "[Grant Cash] advances involve the precise type of deferred presentment scheme that Regulation Z characterizes as credit. [Grant] advances cash in exchange for authorization to debit a borrower's bank account immediately after their employer deposits their paycheck on payday. This practice squarely falls within the definition of credit under TILA" and the MLA by extension. *See id.* The district of Maryland agreed. *Johnson*, 2025 WL 2299425, at \*8. This Court should hold the same.

These cases are consistent with Federal Reserve Board's ("FRB") official staff commentary noted above (12 C.F.R. pt. 1026, Supp. I, Paragraph 2(a)(14) Credit, para. 2), which was issued in response to a novel-at-the-time wave of "payday loans"—including "cash advance," "payday advance," and so-called "deferred presentment" transactions. 65 Fed. Reg. 17129. In a deferred presentment transaction, the borrower writes the lender a check which includes a principal amount and service fee. *Turner v. E-Z Check Cashing, Inc.*, 35 F. Supp. 2d 1042, 1045 (M.D. Tenn. 1999). The lender advances the principal amount to the borrower in cash immediately. *Id.* The borrower agrees that, after a thirty-day period, they will repay the principal and service fee (by allowing the lender to cash the check or via another method) or pay the service fee and write a new check for the principal amount and a new service fee. *Id.* The courts considering the transactions "held, without exception, that deferred presentment transactions are extensions of 'credit' under TILA." *See, e.g.*, *id.* at 1047; *Hamilton v. York*, 987 F. Supp. 953 (E.D. Ky. 1997) (holding "deferred payment transactions"—where borrowers "obtain[ed] cash from [the lender] today" and repaid "substantial sums of money over time"—constituted consumer credit under TILA); *Arrington v. Colleen, Inc.*, No. AMD 00-191, 2001 WL 3411735, at \*3 (D. Md. Mar. 29, 2001) (similar) (collecting cases).

Likewise, the Department of Defense has noted "[m]ost, if not all, 'deposit advance' products would (when offered to a covered borrower) be covered as consumer credit because this type of product typically involves credit extended by a creditor primarily for personal, family, or household purposes for which the borrower pays any fee or charge that is, or is expected to be, repaid from funds available in the borrower's asset account held by that creditor." 80 Fed. Reg. 43560, 43561, 43579–80 (July 22, 2015). Deposit advances are "typically structured as short-term loans," where borrowers "stipulate that repayment will automatically be taken out of the borrower's next [] electronic deposit [*i.e.*, paycheck]."[9]

Grant Cash Advance transactions are functionally identical to deferred presentment transactions and deposit advances. In each case, lenders advance cash to borrowers, who agree to repay the advance and provide repayment authorization at the outset. Like deferred presentment and deposit advance lenders, Grant "disburs[es] funds to people like the plaintiff on the promise of repayment of the sum plus the 'service charge,' at a later time. If this is not an extension of credit, [it is] hard to imagine any transaction that is." *Miller v. HLT Check Exchange (In re Miller)*, 215 B.R. 970, 974 (E.D. Ky. Bkr. 1997); 80 Fed. Reg. at 43579; *accord Orubo*, 780 F. Supp. 3d at 935; *see also Johnson*, 2025 WL 2299425, at \*8.

### ii.    The purported "non-recourse" nature of Grant Cash Advance transactions does not preclude their treatment as consumer credit.

Grant argues its Cash Advance transactions do not constitute credit because of a provision in its terms of service stating Grant "warrants that it has no legal or contractual claim against you based on a failure to repay an Advance." ECF No. 31, at 13–15. However, Grant's attempt to hide behind a "non-recourse" subterfuge specifically designed to skirt regulation applicable to credit fails. Nothing in the MLA, TILA, or Regulation Z limits "credit" to "recourse" obligations.

As a threshold matter, in performing this analysis, this Court must look to the substance of the transaction to determine whether the Grant Cash Advance transactions constitute consumer credit. *See, e.g.*, *Orubo*, 2025 WL 1257695, at \*5 n.5; *Williams v. Chartwell Fin. Servs., Ltd.*, 204

---

[9] Consumer Financial Protection Bureau, *Payday Loans and Deposit Advance Products* 24-25 (April 2013), available at http://files.consumerfinance.gov/f/201304_cfpb_payday-dap-whitepaper.pdf.

F.3d 748, 753 (7th Cir. 2000) ("[C]ourts are to focus on the economic substance of the transaction in determining whether TILA has been violated."); *Edwards v. Your Credit Inc.*, 148 F.3d 427, 436 (5th Cir. 1998) ("[T]he substance-over-form doctrine provides the proper framework for analyzing [TILA]."). Like the TILA, the MLA is a remedial statute which must be "liberally construed to protect consumers." *See Burnett v. Ala Moana Pawn Shop*, 3 F.3d 1261, 1262 (9th Cir. 1993); 10 U.S.C. § 987. Thus, courts "look[] past the form of the transactions to their economic substance in deciding whether the Act applie[s]." *Burnett*, 3 F.3d at 1262.

Paying heed to the "credit" definitions discussed *supra*, the court in *Orubo* easily rejected the argument that only recourse loans constitute consumer credit for at least three reasons: (1) limiting the meaning of consumer credit to recourse loans "would insert into the statutory text language found nowhere therein"; (2) exempting these evident loan transactions from TILA would "disregard[] Regulation Z entirely"; and (3) doing so would "contradict TILA's very purpose, which properly informs the construction of its terms." 2025 WL 1257695, at *5. The District of Maryland agreed. *See Johnson*, 2025 WL 2299425, at *8. These decisions are on all fours with this case considering the MLA embraces a "credit" definition substantively identical to TILA's.

Grant's borrowers are obligated to repay advances, and its "disavowal of any *legal* repayment obligation is no[t] determinative in interpreting TILA [or the MLA] … given the steps [Grant] takes to ensure it will be repaid [] notwithstanding the absence of legal recourse." *Orubo*, 2025 WL 1257695, at *5. Indeed, "borrowers can only obtain advances after [Grant] takes thorough steps to ensure repayment" and "the circumstances under which repayment would not occur are extremely narrow" and unlikely to occur. *Id.* at *3. It is "entirely possible that [Grant's] system is in fact *more* effective in guaranteeing repayment than one that depended on pursuing legal debt collection remedies." *Id.* at *5 n.4; *Johnson,* 2025 WL 2299425, at *8 (same).[10] Grant's

---

[10] Plaintiff alleges that, through comprehensive underwriting procedures, EWA lenders like Grant "recoup their advances at least 97% of the time." Compl., ¶ 89. For comparison, in the fourth quarter of 2024, JP Morgan Chase's credit card services division observed a "net charge-off rate of 3.30%." News Release: Fourth-Quarter 2024 Results, JPMORGANCHASE (Jan. 15, 2025), https://www.jpmorganchase.com/content/dam/jpmc/jpmorgan-chase-and-co/investor-relations/documents/quarterly-Grantgs/2024/4th-quarter/36b3c0a4-3ecd-422e-8167-0a31372f3438.pdf.

Cash Advance product constitutes "credit" under TILA and the MLA, and Grant has proffered no justification to hold otherwise.[11]

*Orubo* and *Johnson* are far from the only courts to reject a defendant's attempt to evade the consumer credit label by characterizing a financial product as non-recourse and thereby not giving rise to a "debt." *See, e.g.*, *Cox v. Cmty. Loans of Am., Inc.*, No. 4:11-CV-177 (CDL), 2014 WL 1216511, at \*17 (M.D. Ga. Mar. 24, 2014) (finding "non-recourse" pawn transactions and "pledge" loans constituted "'consumer credit' transactions within the meaning of the MLA" even though the borrower "did not face any personal liability in connection with [either type of] transaction"); *Cal. Pawnbrokers Ass'n v. Carter*, No. 2:16-cv-02141-JAM-KJN, 2016 WL 6599819, at \*3 (E.D. Cal. Nov. 7, 2016) (holding "nonrecourse" pawn transactions constitute consumer credit under TILA and the MLA); *Fin. Freedom Acquisition, LLC v. Std. Bank & Tr. Co.*, 2015 IL 117950 ¶¶ 26–27, 43 N.E.3d 911, 918 (Ill. 2015) (noting "[r]everse mortgages are consumer credit transactions and clearly covered by TILA" even though they are "nonrecourse"). Where a lender advances money based on the promise of repayment—as in the EWA, pledge loan, pawn transaction, and reverse mortgage contexts—courts hold lending transactions to be consumer credit regardless of "non-recourse" labels. *See generally id.*

### iii.   *Defendants' Expedited Delivery Fees and subscription fees are finance charges*

#### i.   <u>Expedited Delivery Fees are finance charges under the MLA and Regulation Z</u>

Grant next asserts that its Cash Advance product does not qualify as consumer credit because it did not impose a "finance charge" as that term is defined under the MLA. ECF No. 31 at 16–19. Grant is wrong. Defendants' Expedited Delivery Fees constitute finance charges; thus, its Cash Advance product is consumer credit.

---

[11] Further, as a definitional matter, "nonrecourse" describes a type of "obligation." "Nonrecourse" means "[o]f, relating to, or involving an *obligation* that can be satisfied only out of the collateral securing the obligation and not out of the debtor's other assets." *Nonrecourse*, BLACK'S LAW DICTIONARY (12th ed. 2024) (emphasis added). That a lender waives recourse through the court system to enforce an obligation does not mean there is no "obligation" or that there is nothing "owed" to begin with.

OPP. TO MOT. TO STAY IN FAVOR OF ARBITRATION – CASE NO: 3:25-cv-05994-TLT -13

To be considered consumer credit under the MLA, the credit product must be payable in more than four installments or subject to a finance charge. 32 C.F.R. § 232.3(f). Only the latter element is at issue here. In this context, the term "[f]inance charge has the same meaning as 'finance charge' in Regulation Z." In turn, Regulation Z defines "finance charge" as:

> the cost of consumer credit as a dollar amount. It includes any charge payable directly or indirectly by the consumer and imposed directly or indirectly by the creditor as an incident to or a condition of the extension of credit. It does not include any charge of a type payable in a comparable cash transaction.

12 C.F.R. § 1026.4(a) (emphases added); accord 15 U.S.C. § 1605(a).

Expedited Delivery Fees are finance charges under this definition because they are "charge[s] payable directly [] by the consumer and imposed directly [] by the creditor as an incident to or a condition of the extension of credit." 12 C.F.R. § 1026.4(a); *accord* 15 U.S.C. §1605(a). "Instead of showing the charges were a condition of the credit extension, Plaintiffs need only allege a connection between them and the extension of credit." *Golubiewski*, 2025 WL 2484192, at *1. *Orubo* and *Johnson* agreed, finding "voluntary" expedite fees for instant access to cash advances constituted finance charges because they were "incident [*i.e.*, connected] to" the credit extended. *See Orubo*, 2025 WL 1257695, at *7; *Johnson*, 2025 WL 2299425, at *8 (D. Md. Aug. 8, 2025) (The "incident to" language simply requires that the charge be "connected to" the extension of credit (citing *Household Credit Servs., Inc. v. Pfennig*, 541 U.S. 232, 241 (2004))). After all, "incident to" contemplates a "necessary *connection*" with, not a "necessary *condition*[,]" of, the credit product. *Orubo*, 2025 WL 1257695, at *6. Such framing comports with the applicable definitions and the MLA's and TILA's remedial purposes, which "strongly caution[] against construing 'incident to' so narrowly as to exclude all but absolutely necessary conditions." *Id.* at *7.

Judge Pitts' decision in *Orubo* is on all fours. The plaintiff there pled "a close connection between payment of the . . . lightning fee, on the one hand, and [Defendant's] extension of a same-day cash advance, on the other." Id. at *7. On similar allegations, the court found the defendant's "voluntary" expedite fee was "effectively mandatory" (clearing a hurdle even higher than "incident to") because the timing of delivery of funds is a material term and payment of an

expedite fee "is a necessary condition to the extension of credit on the terms being offered [i.e., instantly]." *Id.*

Moreover, after initially holding on a motion to dismiss that "optional" expedite fees were not finance charges, the *Golubiewski* court conducted a "deeper review of the law" and—joining the consensus established in *Orubo* and *Johnson*—reversed course and held that "optional" expedite fees, materially indistinguishable from those challenged here, constitute finance charges sufficient to support violations of TILA (which, in turn, would support a claim under the MLA.). 2025 WL 2484192, at *5–6. Thus, the lone federal court Defendants cited as having "held that voluntary fees like expedite fees 'are not finance charges under TILA'" has since reversed course. ECF No. 31, at 18–19 (quoting *Golubiewski v. Activehours, Inc.*, No. 3:22-cv-02078, 2024 WL 4204272, at *6 (M.D. Pa. Sept. 16, 2024)).

This conclusion is bolstered by cases construing the term "incidental to" a debt in the context of the Fair Debt Collection Practices Act, and analogous state laws. Courts interpreting these laws have held fees a borrower agrees to pay for making loan payments online or over the phone are "incidental" to the amount of the debt, and thus prohibited, even though the fees are optional. *Alexander v. Carrington Mortg. Servs., LLC,* 23 F.4th 370, 377, n.2 (4th Cir. 2022) ("[W]e have a hard time seeing how the convenience fee is not incidental to the debt. Without the mortgage payment, there is of course no convenience fee."); *Glover v. Ocwen Loan Servicing, LLC*, 127 F.4th 1278, 1290 n.13 (11th Cir. 2025) (rejecting argument that voluntarily-paid optional fees are not incidental to the principal debt and reasoning "like the Fourth Circuit, 'we have a hard time seeing how the convenience fee is not incidental to the debt.'") (internal citation and quotation marks omitted)); *Lembeck v. Arvest Cent. Mortg. Co.,* 498 F. Supp. 3d 1134, 1136 (N.D. Cal. 2020) ("The only plausible reading of the word 'incidental' in this context is as a reference to something that is connected to but far less significant than the underlying debt. That describes the [Pay-to-Pay] fee well."); *Williams v. PHH Mortg. Corp.,* No. 4:20-CV-04018, 2021 WL 3556633, at *5 (S.D. Tex. Aug. 11, 2021) (finding collection of optional fees "incidental to" debt and citing dictionary definitions of "incidental"); *Fuentes v. AR Resources, Inc.*, 2017 WL 1197814, at *8 (D.N.J. 2017) ("I therefore join with the majority of district courts to have

considered the question in holding that the optional credit card convenience fee offered in Defendant's Letter to Plaintiff in this case is 'incidental' to Plaintiff's underlying debt."); *Quinteros v. MBI Associates, Inc.*, 999 F. Supp. 2d 434, 439 (E.D.N.Y. 2014) ("the Court finds the processing fee at issue in this case is incidental to the principal obligation"); *Shami v. Nat'l Enter. Sys.,* 2010 WL 3824151, at *3–4 (E.D.N.Y. Sept. 23, 2010) (same).

ii.    **Subscription Fees charged in connection with Grant's Cash Advances are finance charges pursuant to the MLA's definition of interest**

Regulation Z provides "[e]xamples of finance charges," the first of which is: "Interest, time price differential, and any amount payable under an add-on or discount system of additional charges." 12 C.F.R. § 226.4(b)(1). Although Regulation Z does not define "interest," *Davis v. Pac. Capital Bank*, 550 F.3d 915, 917 (9th Cir. 2008), the MLA does:

> The term "interest" includes all cost elements associated with the extension of credit, including fees, service charges, renewal charges, credit insurance premiums, any ancillary product sold with any extension of credit to a servicemember or the servicemember's dependent, as applicable, and any other charge or premium with respect to the extension of consumer credit.

10 U.S.C. § 987(i)(3).[12] Accordingly, for purposes of the MLA, "finance charge" includes all cost elements included in the § 987(i)(3) interest definition.

As explained above, the definition of interest under the MLA is broader than its regular meaning. Furthermore, the Department of Defense promulgated a regulation that mandates inclusion in the calculation of the Military Annual Percentage Rate "[a]ny fee imposed for participation in ay plan or arrangement for consumer credit[.]" 32 C.F.R. § 232.4(c)(1)(iii)(C). *Cf. MoneyLion*, 2025 WL 893684, at *4, *19 (holding "monthly membership fee" charged by creditor "to access" a loan product was interest under the MLA). All that matters is that a charge

---

[12] This definition must be followed even if it conflicts with the ordinary meaning, or other legal definitions, of "interest." See 10 U.S.C. § 987(d)(1) (preempting "any State or Federal law, rule, or regulation" to the extent they are inconsistent); cf. *Digital Realty Tr., Inc. v. Somers*, 583 U.S. 149, 160 (2018) ("'When a statute includes an explicit definition, we must follow that definition,' even if it varies from a term's ordinary meaning.") (internal quotation omitted)).

OPP. TO MOT. TO STAY IN FAVOR OF ARBITRATION – CASE NO: 3:25-cv-05994-TLT -16

be a "cost element" that is "associated with the extension of credit." *See* 10 U.S.C. § 987(i)(3). And that is what subscription charges are—they must be paid to access Grant's Cash Advances.

Defendants' brief argument that their membership fees entail access to additional perks, and thus are not finance charges, is insufficient to defeat Plaintiff's well-pleaded allegations under Rule 12(b)(6). As the *MoneyLion* court reasoned, "[t]he regulation does not say [] that participation fees must be imposed 'solely' or 'exclusively' for a loan itself." 2025 WL 893684, at *21. Perhaps "there could be some point at which the existence of sufficient benefits beyond the loans themselves would undermine" Plaintiff's argument that Grant's membership fees are finance charges, but Defendants' argument here "raises at most a factual issue not amenable to resolution at the pleading stage." *Id.*

### iii.    Defendants' arguments do not change the above analysis

#### 1.    It is irrelevant that Defendants' characterize some charges as optional

Defendants cherry-pick language from the Federal Reserve's 1996 rule to argue "most voluntary fees" are not finance charges under the separate exclusion for charges that are "payable in a comparable cash transaction." Mot. at 16. Defendants miss the mark for at least two reasons.

First, and most fundamentally, Defendants' claim that only "mandatory" fees constitute finance charges is at odds with the statutory definition of "finance charge," which uses the disjunctive "or" to separate charges imposed as (1) an incident to credit, *or* (2) a condition of credit. *See Loughrin v. United States*, 573 U.S. 351, 357 (2014) (disjunctive "or" signals that "words it connects are to be given separate meanings"). Accepting Defendants' interpretation would defy this rule and render the words "incident to" superfluous. *See United States v. Wenner*, 351 F.3d 969, 975 (9th Cir. 2003) ("[A] statute should not be construed so as to render any of its provisions mere surplusage.").

On this very issue, this Court, *Johnson*, and *Golubiewski* each found purported "voluntary" Lightning Speed Fees and tips constitute finance charges because they are an "incident [*i.e.*, connected] to" the credit extended, rejecting that only mandatory fees count. *Orubo*, 2025 WL 1257695, at *7; *Johnson,* 2025 WL 2299425, at *8; *Golubiewski*, 2025 WL

2484192, at *6. Just as in each of these cases, Plaintiff has pleaded "a close connection between payment of the [Expedited Delivery Fee and subscription charge], on the one hand, and [Grant's] extension of a same-day cash advance, on the other." *Orubo*, 2025 WL 1257695, at *7; *Johnson*, 2025 WL 2299425, at *8; *Golubiewski*, 2025 WL 2484192, at *6.

So, *Orubo*, *Johnson*, and *Golubiewski* are directly on point and confirm Grant's Expedited Delivery Fees are finance charges. Consistent with *Orubo*, Plaintiff here alleges Grant's Expedited Delivery Fees are "inextricably intertwined" with receiving instant Cash Advances. 2025 WL 1257695, at *7. The time and manner by which funds are disbursed are "material term[s] of credit" (*see id.*), and Plaintiff allege Expedited Delivery Fees are unavoidable to unlock the instant-funding loan product that Grant offers. *See Truth in Lending*, 61 Fed. Reg. at 49239.

Second, when Defendants quoted from the Federal Reserve's 1996 rule, they omitted the most relevant part: its analysis explaining what "voluntary fees" it considered to be "payable in a comparable cash transaction." The regulatory language quoted by Defendants states, in full:

> As a practical matter, most voluntary fees are excluded from the finance charge under the separate exclusion for charges that are payable in a comparable cash transaction, such as fees for optional maintenance agreements or fees paid to process motor vehicle registrations. In the case of debt cancellation agreements, however, the voluntary nature of the arrangement does not alter the fact that debt cancellation coverage is a feature of the loan affecting the total price paid for the credit.

61 Fed. Reg. at 49239.

Indeed, the Federal Reserve has long recognized "optional charges" may be finance charges: "even though a lender may not require a particular loan feature, the feature may become a term of the credit if it is included." *Truth in Lending*, 61 Fed. Reg. 49237, 49239 (Sept. 19, 1996). So, even where a feature is not required, "when it is included for an additional charge…, that amount properly represents part of the finance charge for that particular loan, even though less costly loans may be available without that feature." *Id.* This analysis applies to Expedited Delivery Fees. Borrowers who use the instant version of Grant's Cash Advance must pay "an additional charge[, and thus] that amount properly represents part of the finance charge for that particular loan, even though less costly loans may be available without [the instant delivery] feature." *See id.*

The Expedited Delivery Fees that users *must* pay to receive Grant's Cash Advance instantly bear no resemblance to the optional fees for products and services *unrelated to the credit product* mentioned by the FRB—like "maintenance agreements" or "fees paid to process motor vehicle registrations" in an automobile purchase transaction. *See* 61 Fed. Reg. at 49239. Defendants' Expedited Delivery Fees are much closer to the "debt cancellation coverage" the FRB mentions which, though voluntary, is "a feature of the loan affecting the total price paid for the credit" and thus charges for that coverage constitute finance charges. *See id.* What's more, Defendants fail to show that "subscription" fees are charges "payable in a *comparable* cash transaction." *See id.* The FRB's 1996 regulation firmly supports Plaintiff's position.

Defendants' citation to *Veale v. Citibank, F.S.B.*, 85 F.3d 577 (11th Cir. 1996) also does not change the analysis about "optional fees." The Veales refinanced their home by securing a $361,800.00 loan from Citibank, using the loan's proceeds to pay off other lenders. *Id*. at 578. Citibank charged a $21.00 fee—characterized variously as an "Airborne fee" and "Federal Express Charge" (the "FedEx fee")—to offset postage fees paid to ship checks to pay off the other pre-refinanced creditors. *Id*. at 578–79. The plaintiffs claimed the FedEx fee was an undisclosed finance charge, a proposition the Eleventh Circuit rejected: the FedEx fee at issue was both optional and unrelated to the Citibank credit product generally or as to any "particular feature." Indeed, the fee merely reimbursed Citibank for shipping charges incurred to mail checks drawn from the refinanced loan to the original third-party creditors after the loan was funded.[13]

Unlike the FedEx fee, borrowers cannot access the instant version of Grant's Cash Advance without paying an Express Fee. The fee unlocks a "particular feature" of the credit product as opposed to merely offsetting a postage fee to mail loan proceeds to third parties after a loan is issued. *Veale* is inapposite. Defendants' further examples of ATM fees, bank and credit union fees, and digital wallet fees miss the mark for the same reasons.[14]

---

[13] That the FedEx fee is not "incident to" the loan can be seen by considering a counterfactual where the Veales had to mail checks to their mortgagees themselves. In such hypothetical, Citibank's credit product would be precisely the same—same amount issued on the same date— and the Veales would have paid FedEx (or some other courier) to ship the payoff checks themselves. The FedEx fee thus was not "incident to" the extension of credit.

[14] In addition, Defendants offer no argument or authority indicating these fees are levied in *comparable cash transactions*. Defendants' citation to dissimilar fees charged in distinguishable contexts fails to alter the above analysis.

OPP. TO MOT. TO STAY IN FAVOR OF ARBITRATION – CASE NO: 3:25-cv-05994-TLT -19

2. ***The terminated CFPB Order Cited by Defendants is off-point.***

Defendants also cite a terminated CFPB order addressing a wholly different fee charged by an employer-partnered EWA provider. ECF No. 31, at 17. That order held a $1.00 fee for access to an EWA product "did not bear hallmarks of" a finance charge because it was nominal, comparable to transfer fees for non-credit products, and did "not vary based on factors such as the amount of the transaction." *Id.* at 5. Defendants' Expedited Delivery Fees and subscription fees fit none of these criteria. *See* Compl., ¶¶ 44–92. For example, Plaintiff specifically alleges that the Expedited Delivery Fees challenged here increase with the amount of the transaction. *Id.*, ¶ 53. Thus, even had the CFPB approval order not been terminated, its analysis aids Plaintiff's arguments.

3. ***Regulations about credit cards do not apply to this case***

Defendants also invoke a regulation holding "fees for expediting delivery of a credit or charge card" are not finance charges "where the consumer requests the service and the card is also available by standard mail service." ECF No. 31, at 17–18; 68 Fed. Reg. 16185, 16187 (Apr. 3, 2003). But Expedited Delivery Fees do not fit the exception since they are not "fees for expediting delivery of a credit or charge card."

Rather, the Expedited Deliver Fee is a service charge for access to borrowed funds for a longer period compared to those who do not pay the charge. The basic economic reality is that those who pay the service charge receive credit during the three-day period, while those who do not pay the service charge must wait. A fundamental characteristic of credit is paying interest or fees in exchange for the time use of money. Consumers who are deciding whether to pay the service charge for access to their loan are entitled to MLA and TILA price disclosures that allow them to make an informed decision about the cost of paying the finance charge in comparison to other options, such as using a credit card, using a bank or credit union line of credit, turning to a pawn shop, or even waiting up to three days for a less expensive loan from Grant itself.

iv. **Plaintiff's TILA and GPLA claims may not be arbitrated**

Defendants alternatively argue that, even if the MLA applies, the Court should nevertheless compel arbitration of Plaintiff's TILA and GPLA claims. Motion at 20–21. This ignores that, "[i]f the MLA applies to a contract involving the extension of consumer credit, the district court cannot enforce any agreement in that contract to arbitrate *any dispute*." *Steines*, 113 F. 4th at 1344 (emphasis added); 10 U.S.C. §§ 987(f)(3), (4) (prohibiting arbitration of "any dispute involving" consumer credit to a covered member and holding violative agreements "void from the inception").

This conclusion flows from the MLA's text, which holds that "no agreement to arbitrate *any dispute* involving the extension of consumer credit shall be enforceable against any covered member," and "[a]ny credit agreement, promissory note, or other contract prohibited under this section is void from the inception of such contract." *See* 10 U.S.C. §§ 987(f)(3), (4) (emphasis added). The MLA does not simply preclude arbitration as to claims arising under the MLA, but rather (1) prohibits the enforcement of arbitration agreements for "any dispute involving" a consumer credit agreement "against any covered member" and (2) declares such agreements "void from the inception of such contract." *See id.* Accordingly, neither Plaintiff's MLA claim, his TILA claim, nor his GLPA claim may be compelled to arbitration.

### v.    <u>Defendants' Class Action Waiver is Unenforceable Against Plaintiff</u>

Last, Plaintiff notes Defendants' argument to strike Plaintiff's class action allegations, citing a class action waiver located in a paragraph of Defendants' terms titled, "DISPUTE RESOLUTION BY BINDING ARBITRATION; JURY TRIAL & CLASS ACTION WAIVER." ECF No. 31, at 10 (citing ECF No. 31-1, at p. 21–22). This argument fails several times over.

First, by its terms and as Defendants concede, the class action waiver applies only to arbitration proceedings, as evidenced by the numerous references to "ARBITRATION" and the "ARBITRATOR" therein. *See* ECF No. 31-1, at 16; ECF No. 31, at 11 ("[T]he Arbitration Agreement contains an express waiver of class or collective arbitration[.]"). Second, for similar reasons, the class action waiver is a component of Defendants' arbitration agreement, which the

MLA independently renders nugatory. *See* 10 U.S.C. § 987(f)(4). Thus, no part of Defendants' "agreement to arbitrate" may be enforced, including the encompassed class waiver.

Third, class action waivers are expressly precluded by the MLA. See 10 U.S.C. § 987(e)(2) ("It shall be unlawful for any creditor to extend consumer credit to a covered member [] with respect to which the borrower is required to waive the borrower's right to legal recourse under any otherwise applicable provision of State or Federal law."). And fourth, Defendants' usurious Cash Advances that violate the MLA, along with the class waiver contained therein, are "void from the inception of" the Cash Advance credit agreements and therefore unenforceable. *See id.* § 987(f)(3).

## VI.    CONCLUSION

Plaintiff has pleaded facts that, taking all reasonable inferences in his favor, demonstrate Defendants extended him consumer credit. As such, the Military Lending Act applies, and none of his claims can be arbitrated. Therefore, Defendants' motion to shunt this case into individual arbitration should be denied.

Dated:  September 8, 2025                        Respectfully submitted,

CARNEY BATES & PULLIAM, PLLC

*/s/ Lee Lowther*
Randall K. Pulliam (*pro hac vice*)
Lee Lowther (*pro hac vice*)
Courtney Ross Brown (*pro hac vice*)
One Allied Drive, Suite 1400
Little Rock, AR, 72202
Telephone: (501) 312-8500
Email: rpulliam@cbplaw.com
Email: llowther@cbplaw.com
Email: cbrown@cbplaw.com

CONN LAW, PC
Elliot Conn Bar No. 279920
elliot@connlawpc.com
100 Bush Street, Suite 1580
San Francisco, CA 94104
Telephone: (415) 417-2780
Facsimile: (415) 358-4941

JACOBSON PHILLIPS PLLC
Joshua R. Jacobson (*pro hac vice*)
2277 Lee Road, Suite B
Winter Park, FL 32789

Telephone: (321) 447-6461
Email: joshua@jacobsonphillips.com

*Attorneys for Plaintiff John Revell*
*and the Proposed Classes*