UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHN REVELL, et. al. | Case No. 25-cv-05994-TLT |
| Plaintiff, | |
| v. | **ORDER DENYING MOTION TO STAY INDIVIDUAL CLAIMS IN FAVOR OF ARBITRATION AND STRIKE CLASS CLAIMS** |
| GRANT MONEY, LLC, et al., | |
| Defendants. | Re: Dkt. No. 31, 32 |

Plaintiff John Revell ("Plaintiff") is a Staff Sergeant in the U.S. Army who obtained an earned wage advance ("EWA") from Defendants Grant Money, LLC, and Kikoff Inc. (collectively "Defendants"). Plaintiff asserts that the terms of the EWA violate three consumer protection laws. Plaintiff brings these claims individually, on behalf of three proposed classes, and on behalf of the general public. Defendants argue that Plaintiff signed an arbitration agreement, which requires the Court to compel Plaintiff's individual claims to arbitration and strike Plaintiff's class claims. Plaintiff contends that as a Staff Sergeant, the arbitration agreement cannot be enforced against him and these claims can all proceed in court.

Before the Court is Defendants' (1) request for judicial notice (2) motion to stay Plaintiff's individual claims in favor of arbitration (3) and motion to strike Plaintiff's class claims. *See* ECF 31; ECF 32.

After review and consideration of the motion, briefings, attachments and exhibits thereto, the Court **GRANTS** Defendants' request for judicial notice and **DENIES** Defendants' motion to stay the action in favor of compelling Plaintiff's individual claims to arbitration. Because the Court finds the arbitration agreement unenforceable against Plaintiff, the Court also **DENIES** the

motion to strike Plaintiff's class claims as premature. The Plaintiff has not filed a motion for class certification. As such, the Court does not rule on the certifiability of the classes.

## I. PROCEDURAL HISTORY

On June 10, 2025, Plaintiff filed a complaint in the Superior Court of California, County of San Francisco, alleging violations of (1) the Military Lending Act ("MLA"), 10 U.S.C. § 986, *et seq.*; (2) the Truth in Lending Act ("TILA"), 15 U.S.C. § 1601, *et seq.*; and (3) the Georgia Payday Loan Act ("GPLA"), O.C.G.A. § 16-17-1, *et seq.* ECF 1-2. Plaintiff alleges that Defendants: (1) offered loans with interest rates in excess of 36% military annual percentage rate ("MAPR"), failed to make required disclosures, and bound customers to mandatory arbitration in violation of the MLA, ECF 45 ¶¶ 114–129; (2) failed to make required disclosures in violation of the TILA, *Id.* ¶¶ 130–137; and (3) issued loans of $3,000 or less in violation of the GPLA, without meeting any of the statutory exemptions. *Id.* ¶¶ 138–146. Plaintiff brings his claims individually, on behalf of three proposed classes: "MLA Class," "TILA Class," and "Georgia Class," and on behalf of the "general public." *Id.* ¶ 103–105; *id.* at 1.

On July 16, 2025, Defendants removed this matter to federal court. ECF 1.

On July 21, 2025, Defendants filed a motion to stay Defendants' obligations to respond to the complaint, pending resolution of Defendants' anticipated motion to compel arbitration. ECF 15. On July 24, 2025, Plaintiff filed an opposition. ECF 25. On July 25, 2025, the Court granted Defendants' motion to stay Defendants' answer until after the Court rules on Defendants' motion to compel arbitration. ECF 26.

On August 8, 2025, Defendants filed a motion to stay Plaintiff's individual MLA, TILA, and GPLA claims in favor of arbitration, and to strike the class claims brought by Plaintiff. ECF 31. On August 8, 2025, Defendants also filed a request for judicial notice. ECF 32. On September 8, 2025, Plaintiff timely filed an opposition. ECF 33. On September 29, 2025, Defendants timely filed a reply. ECF 36. On September 9, 2025, Plaintiff filed a notice of supplemental authority. ECF 34. On October 7, 2025, Plaintiff filed a second notice of supplemental authority. ECF 37.

On October 9, 2025, the Court ordered the parties to submit written responses to questions.

ECF 38.  The parties submitted responses on October 14, 2025.  ECF 42; ECF 43.  On October 16, 2025 Plaintiff filed a corrected complaint.  ECF 45.  The parties stipulated to apply the pending motion to compel to the corrected complaint.  ECF 47. Therefore, the operative complaint is ECF 45.

The Court held oral argument on October 21, 2025.  ECF 50.

## II.    FACTUAL BACKGROUND

Plaintiff has been an active-duty member of the U.S. Army for over fifteen years.  ECF 45 ¶¶ 4, 12.  Grant Money, LLC ("Defendant Grant") offers an EWA product for individuals seeking an advance on their paycheck.  *Id.* ¶ 2.  Kikoff Inc. ("Defendant Kikoff") operates the smartphone application that customers use to secure an EWA.  *Id.* ¶ 14.  Defendant Grant is a wholly owned subsidiary of Defendant Kikoff.  ECF 2; ECF 31 at 2 n.1.  Defendants' mobile application was called "Oasis" at the time Plaintiff used the application.  *See* ECF 31 at 1.  Accordingly, the Court refers to the application Plaintiff used by the name "Oasis."  Notably, the application has since been rebranded to "Grant," so the parties' references to "Grant" are interchangeable.  *Id.* at 2 n.3; ECF 31-1, Declaration of Jennifer Bell ("Bell Decl."), ¶ 6.

Defendants' EWA product provides "qualified, eligible" customers access to cash before the customer's next paycheck is deposited in the customer's bank account.  Bell Decl., Ex. 1 at 1.  EWA amounts vary from $25 to $250.  *Id.*  Defendants advertise their product as providing "[f]ast," "instant[]" "[c]ash at your fingertips."  ECF 45 ¶¶ 55–56.  Specifically, "if you don't receive your Cash Advance within a few hours, reach out to us."  *Id.* ¶ 56.

Customers are not automatically approved for Defendants' EWA product.  *Id.* ¶ 71.  Before receiving an EWA, customers sign up via the Oasis application and must link a bank account and debit card to their profile.  *Id.* ¶¶ 49, 83, 87; ECF 31 at 2; Bell Decl., Ex. 1 at 1.  Defendant Grant uses data from a third-party service, Plaid, to evaluate (1) transaction history in the customer's primary checking account; (2) whether the customer has a consistent income source; and (3) whether any income source is being deposited into the account through a direct deposit.  ECF 45 ¶¶ 72–78.  After determining that a customer is qualified, Defendant Grant uses data from Plaid to create repayment schedules, set up automatic debits from the linked account, and monitors the

transaction data and income of the customer to determine if their qualifications change.  *Id.* ¶¶ 73, 75, 77–80.

Oasis automatically schedules repayment of the EWA for the customer's next payday.  *Id.* ¶ 85.  The Customer Agreement describes Defendants' EWAs as "non-recourse," meaning that Defendants "ha[ve] no legal or contractual claim" against customers "based on a failure to repay."  Bell Decl., Ex. 1 ¶¶ 2–4.  However, if a customer's linked bank account does not have sufficient funds to make a scheduled repayment, the application debits the amount available and collects the remainder the next time funds are added to the account.  *Id.* ¶ 88.  In this scenario, Defendants "reserve[] the right to suspend . . . access to the services until [the customer] repay[s]."  Bell Decl., Ex. 1 ¶ 4.  Customers may not take out additional EWAs until the first repayment is completed.  ECF 45 ¶ 90.  Nor can customers cancel a scheduled repayment.  *Id.* ¶ 86.

The delivery of an EWA typically takes three business days.  Bell Decl., Ex. 1.  To expedite delivery of an EWA, customers may pay an additional Instant Delivery Fee to expedite the EWA ("expedite fee").  Expedite fees range from $2.00 to $8.00, and the amount varies depending on the size of the requested EWA.  ECF 45 ¶ 53; Bell Decl., Ex. 1 at 1.  Once a customer pays an expedite fee, Oasis "typically" delivers the EWA within one hour, but does not guarantee any delivery time.  Bell Decl., Ex. 1 at 1.

Defendants also charge subscription fees.  ECF 45 ¶ 59.  Plaintiff alleges that "subscription fees are mandatory fees that must be paid to use the platform and access [EWAs]."  *Id.* ¶ 61.  However, the Customer Agreement states that a subscription is not required to access an EWA, but the subscription fees entitle customers to "additional, exclusive premium features."  *Id.*  During the class period, Defendant Grant charged customers $9.99 each month as a subscription fee.  ECF 45 ¶ 59.  Plaintiff also alleges that customers are charged subscription fees biweekly.  *Id.* ¶ 61.

Defendants earn "triple and quadruple-digit finance charges" on EWAs.  *Id.* ¶ 3.  Plaintiff's EWAs "routinely" had APRs exceeding 1000%.  *Id.* ¶¶ 65, 98.

When creating an account on Oasis, customers must accept certain terms.  ECF 31 at 3.  The Customer Agreement is hyperlinked on the "Create your account" page.  *Id* at 1.  The first

4

page of the Customer Agreement says, "By accessing or using [Oasis], you . . . agree that you have read, understand, and agree to be bound by the following agreements." Bell Decl., Ex. 1 at 1. The three agreements listed are: Terms of Service, Privacy Policy, and "the ESIGN Consent to Use Electronic Records, Disclosures, and Signatures." *Id.*

At the top of the second page, the Customer Agreement says,

> PLEASE READ THESE TERMS OF SERVICE CAREFULLY, AS THEY CONTAIN AN ARBITRATION AGREEMENT AND OTHER IMPORTANT INFORMATION REGARDING YOUR AND OUR LEGAL RIGHTS, REMEDIES AND OBLIGATIONS IN THE EVENT OF A DISPUTE BETWEEN YOU AND US. THE ARBITRATION AGREEMENT REQUIRES DISPUTES BETWEEN YOU AND US (WITH LIMITED EXCEPTIONS) TO BE RESOLVED BY AN ARBITRATOR THROUGH BINDING AND FINAL ARBITRATION, RATHER THAN BY A JUDGE OR JURY IN COURT. IF A DISPUTE IS ARBITRATED (1) YOU AND WE WILL ONLY BE PERMITTED TO PURSUE CLAIMS AGAINST ONE ANOTHER ON AN INDIVIDUAL BASIS, NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY CLASS OR REPRESENTATIVE ACTION OR PROCEEDING, AND (2) YOU AND WE WILL ONLY BE PERMITTED TO SEEK RELIEF (INCLUDING MONETARY, INJUNCTIVE, AND DECLARATORY RELIEF) ON AN INDIVIDUAL BASIS. YOU HAVE THE RIGHT TO REJECT THE ARBITRATION AGREEMENT AS SET FORTH BELOW.

Section 36 of the Customer Agreement contains an arbitration agreement. Bell Decl., Ex. 1 ¶ 26. The arbitration agreement is titled, "DISPUTE RESOLUTION BY BINDING ARBITRATION; JURY TRIAL & CLASS ACTION WAIVER." *Id.* At the top of Paragraph 26, the arbitration agreement states: "This Dispute Resolution by Binding Arbitration section is referred to in these Agreements as the 'Arbitration Agreement.'" *Id.* The arbitration agreement states:

> You and we agree that any and all past, present or future disputes, claims or controversies that have arisen or may arise between you and Company, whether arising out of or relating to these Agreements (including any alleged breach thereof), the services, the App, your Account, any advertising or any other aspect of the relationship or transactions between you and us (collectively, "Claims"), shall be resolved by an arbitrator through final and binding arbitration, rather than by a judge or jury in court, in accordance with the terms of this Arbitration Agreement.

> The term "Claim" has the broadest reasonable meaning and includes, without limitation: (1) initial claims, counterclaims, crossclaims and third-party claims; (2) disputes based upon contract, negligence, fraud

and other intentional torts, constitution, statute, regulation, ordinance, common law and equity; (3) data breach or privacy claims; and (4) claims arising out of or relating to our written or oral communications with or about you. Claims are subject to arbitration even if they arise out of or relate to actions, omissions, transactions, facts, or conduct that occurred before this Arbitration Agreement took effect.

*Id.* Following these paragraphs, the arbitration agreement contains a class action waiver. The waiver states:

YOU AND WE AGREE THAT EACH OF US MAY BRING CLAIMS AGAINST THE OTHER ONLY ON AN INDIVIDUAL BASIS AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS, COLLECTIVE, PRIVATE ATTORNEY GENERAL OR REPRESENTATIVE ACTION OR PROCEEDING. THE ARBITRATOR MAY NOT CONSOLIDATE OR JOIN ONE PERSONS OR PARTYS CLAIMS WITH CLAIMS OF ANY OTHER PERSON OR ENTITY UNLESS ALL PARTIES OTHERWISE AGREE IN WRITING. ALSO, THE ARBITRATOR MAY AWARD RELIEF (INCLUDING MONETARY, INJUNCTIVE, AND DECLARATORY RELIEF) ONLY IN FAVOR OF THE INDIVIDUAL PARTY SEEKING RELIEF AND ONLY TO THE EXTENT NECESSARY TO PROVIDE RELIEF NECESSITATED BY THAT PARTYS INDIVIDUAL CLAIM(S). THE VALIDITY AND EFFECT OF THIS CLASS ACTION WAIVER SHALL BE DETERMINED EXCLUSIVELY BY A COURT, AND NOT BY THE ADMINISTRATOR OR ANY ARBITRATOR. JURY TRIAL WAIVER: IF YOU OR WE ARBITRATE A CLAIM, YOU AND WE WILL NOT HAVE THE RIGHT TO PURSUE THAT CLAIM IN COURT OR HAVE A JURY DECIDE THE CLAIM.

At the bottom of the arbitration agreement, there is a subheading: "RIGHT TO REJECT." *Id.* This subsection states:

You may reject this Arbitration Agreement if you do not want it to apply. Rejection of this Arbitration Agreement will not affect the remaining parts of this Agreement. To reject this Arbitration Agreement, you must send written notice of your rejection within 30 days after the date that we approve your application for an Account. You must include your name, address, and Account number. The notice of rejection must be mailed to the Notice Address provided above. This is the only way that you can reject this Arbitration Agreement.

In December 2024, Plaintiff signed up to use the Oasis application. Bell Decl., ¶ 2. He accepted Defendants' Terms of Service. *Id.* ¶¶ 3–4. Specifically, Plaintiff was required to scroll through Defendants' Customer Agreement and click to accept the agreement. *Id.* ¶ 8.

Plaintiff admits that he secured at least three EWAs from Defendants. ECF 45 ¶ 95, and that he paid both subscription fees and expedite fees. *Id.* ¶¶ 97–99. The three EWAs that Plaintiff

United States District Court
Northern District of California

mentions in his complaint had principal amounts of $75.00 to $100.00.  *Id.*  Plaintiff repaid the EWAs in two to six days.  *Id.*

### III.  THE COURT GRANTS DEFENDANT'S REQUEST TO INCORPORATE BY REFERENCE THE CUSTOMER AGREEMENT

Defendants request that the Court incorporate by reference a copy of the Customer Agreement referenced in Plaintiff's complaint and attached as an exhibit to Defendants' motion. Bell Decl., Ex. 1.  Plaintiff does not oppose this request or dispute that Exhibit 1 is a true and correct copy of the Customer Agreement he saw when he signed up.  ECF 42.

"The [C]ourt may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b).  Alternatively, the Court may "consider materials that are submitted with and attached to the Complaint. [The Court] may also consider unattached evidence on which the complaint 'necessarily relies' if: (1) the complaint refers to the document; (2) the document is central to the plaintiff's claim; and (3) no party questions the authenticity of the document."  *United States v. Corinthian Colls.*, 655 F.3d 984, 999 (9th Cir. 2011); *see also In re Diamond Foods, Inc. Sec. Litig.*, No. 11-cv-05386, 2012 WL 6000923, at *16 (N.D. Cal. Nov. 30, 2012) ("Under the incorporation by reference doctrine, a court may also consider documents submitted by defendants that were referenced in the complaint and whose authenticity has not been questioned.").

The Court finds that incorporation by reference of the Customer Agreement is appropriate because no party questions the authenticity of the document, as evidenced by both parties citing the Customer Agreement multiple times in their briefing.  *See e.g.*, ECF 31 at 4, 6; ECF 33 at 21–22.  Plaintiff's complaint also "necessarily relies" on the Customer Agreement.  ECF 45 ¶¶ 101–102; *In re Diamond Foods*, 2012 WL 6000923, at *16.  Accordingly, the Court **GRANTS** Defendants' request to incorporate the Customer Agreement by reference.

United States District Court
Northern District of California

7

United States District Court
Northern District of California

## IV.    LEGAL STANDARDS

### A.    Federal Arbitration Act ("FAA"), 9 U.S.C. § 2 *et seq.*

The Federal Arbitration Act (FAA) governs any arbitration agreement that is "written" and in a contract "evidencing a transaction involving commerce." 9 U.S.C. § 2. Under the FAA, arbitration agreements are "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." *Id.* As the Supreme Court has explained, "[t]he overarching purpose of the FAA . . . is to ensure the enforcement of arbitration agreements according to their terms so as to facilitate streamlined proceedings." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 344 (2011). This "liberal federal policy favoring arbitration agreements" applies "notwithstanding any state substantive or procedural policies to the contrary." *Id.* at 346 (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983)).

"Like any statutory directive, the Arbitration Act's mandate may be overridden by a contrary congressional command. The burden is on the party opposing arbitration, however, to show that Congress intended to preclude a waiver of judicial remedies for the statutory rights at issue. If Congress did intend to limit or prohibit waiver of a judicial forum for a particular claim, such an intent will be deducible from [the statute's] text or legislative history, or from an inherent conflict between arbitration and the statute's underlying purposes. *Shearson/Am. Exp., Inc. v. McMahon*, 482 U.S. 220, 226–27 (1987) (internal citations omitted).

In deciding whether to compel arbitration, a district court must determine (1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue. *Brennan v. Opus Bank*, 796 F.3d 1125, 1130 (9th Cir. 2015). Courts "should apply ordinary state-law principles that govern the formation of contracts." *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995). If the court is satisfied "that the making of the agreement for arbitration or the failure to comply therewith is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement." 9 U.S.C. § 4. "[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Moses*, 460 U.S. at 24–25.

**B. Military Lending Act ("MLA"), 10 U.S.C. § 987 *et seq*.**

**i. Statutory Cap of 36% Annual Percentage Rate**

The MLA, 10 U.S.C. § 987, *et seq.*, is a federal law that governs certain loans and loan terms for servicemembers ("covered members") and their dependents, to protect them from certain lending practices. *See* 10 U.S.C. §§ 987(a), (i)(1)–(2). Among other provisions, the MLA states:

(a) Interest.—A creditor who extends consumer credit to a covered member of the armed forces or a dependent of such member shall not require the member or dependent to pay interest with respect to the extension of such credit, except as (1) agreed to under the terms of the credit agreement or promissory note; (2) authorized by applicable State or Federal law; and (3) not specifically prohibited by this section.

(b) Annual Percentage Rate.—A creditor described in subsection (a) may not impose an annual percentage rate of interest greater than 36% with respect to the consumer credit extended to a covered member or a dependent of a covered member.

**ii. Disclosure Requirements**

The MLA requires certain disclosures "[w]ith respect to the extension of any consumer credit (including any consumer credit originated or extended through the internet) to a covered member." 10 U.S.C. § 987(c)(1). "[C]reditor[s]" "shall provide to the member or dependent the following information orally and in writing before the issuance of the credit: (a) A statement of the annual percentage rate of interest applicable to the extension of credit. (b) Any disclosures required under the Truth in Lending Act (15 U.S.C. 1601 *et seq.*). (c) A clear description of the payment obligations of the member or dependent, as applicable." *Id.*

**iii. Unlawful and Unenforceable Arbitration Agreements**

Subsection (e)(3) of the MLA states: "It shall be unlawful for any creditor to extend consumer credit to a covered member or a dependent of such member with respect to which . . . (3) the creditor requires the borrower to submit to arbitration . . ." 10 U.S.C. § 987(e)(3).

Subsection (f)(4) of the MLA states: "Notwithstanding section 2 of title 9, or any other Federal or State law, rule, or regulation, no agreement to arbitrate any dispute involving the extension of consumer credit shall be enforceable against any covered member or dependent of such a member, or any person who was a covered member or dependent of that member when the agreement was made." 10 U.S.C. § 987(f)(4).

/ / /

United States District Court
Northern District of California

United States District Court
Northern District of California

### iv.    Definition of "Credit"

The MLA implementing regulations state: "Credit means the right granted to a consumer by a creditor to defer payment of debt or to incur debt and defer its payment." 32 C.F.R. § 232.3(h).

### v.    Definition of "Consumer Credit"

"Consumer credit" is a sub-category of credit defined in the MLA implementing regulations. 10 U.S.C. § 987(i)(6). "Consumer credit means credit offered or extended to a covered borrower primarily for personal, family, or household purposes, and that is: (i) Subject to a finance charge; or (ii) Payable by a written agreement in more than four installments." 32 C.F.R. § 232.3(f)(1).

### vi.    Definition of "Finance Charge"

"Finance charge" under the MLA "has the same meaning as 'finance charge'" in the TILA. 32 C.F.R. § 232.3(n). "The finance charge is the cost of consumer credit as a dollar amount. It includes any charge payable directly or indirectly by the consumer and imposed directly or indirectly by the creditor as an incident to or a condition of the extension of credit. It does not include any charge of a type payable in a comparable cash transaction." 12 C.F.R. § 1026.4.

### C.    Truth in Lending Act ("TILA"), 15 U.S.C. § 1601 *et seq.*

#### i.    Disclosure Requirements

"Congress enacted TILA to promote 'the informed use of credit' by consumers." *Davenport v. Litton Loan Servicing, LP*, 725 F. Supp. 2d 862, 872 (N.D. Cal. 2010) (quoting 15 U.S.C. § 1601(a)). TILA seeks to "assure a meaningful disclosure of credit terms" to assist consumers in making informed decisions and protect them from unfair credit practices. *Beach v. Ocwen Fed. Bank*, 523 U.S. 410, 412 (1998) (quoting 15 U.S.C. § 1601(a)). Under TILA, creditors must disclose the: (1) identity of the creditor; (2) amount financed; (3) finance charge; (4) annual percentage rate; (5) sum of the amount financed and the finance charge, or total of payments; and (6) number, amount, and due dates or period of payments scheduled. 15 U.S.C. § 1638(a)(1)–(6). TILA's disclosure requirements apply to any creditor that regularly extends credit for which the payment of a "finance charge" is required. 15 U.S.C. § 1602(g)(1).

### ii.    Definition of "Credit"

The TILA states: "The term 'credit' means the right granted by a creditor to a debtor to defer payment of debt or to incur debt and defer its payment." 15 U.S.C. § 1602(f). Official commentary to the TILA implementing regulations ("Regulation Z") further states:

> Payday loans; deferred presentment: Credit includes a transaction in which a cash advance is made to a consumer in exchange for the consumer's personal check, or in exchange for the consumer's authorization to debit the consumer's deposit account, and where the parties agree either that the check will not be cashed or deposited, or that the consumer's deposit account will not be debited, until a designated future date. This type of transaction is often referred to as a "payday loan" or "payday advance" or "deferred-presentment loan." A fee charged in connection with such a transaction may be a finance charge for purposes of § 1026.4, regardless of how the fee is characterized under state law. Where the fee charged constitutes a finance charge under § 1026.4 and the person advancing funds regularly extends consumer credit, that person is a creditor and is required to provide disclosures consistent with the requirements of Regulation Z. (*See* § 1026.2(a)(17).).

12 C.F.R. § 1026, Supp. I, Paragraph 2(a)(14), ¶ 2.

### D.    Georgia Payday Loan Act ("GPLA"), O.C.G.A. § 16-17-2(a)

The GPLA prohibits "the making of loans of $3,000.00 or less" unless the lender is a bank or otherwise licensed to do so under a Georgia licensing statute. O.C.G.A. § 16-17-2(a). The statute "does not expressly define the term 'loan.'" *Ruth v. Cherokee Funding, LLC*, 304 Ga. 574, 579 (2018). The Supreme Court of Georgia has held that the statute "implicitly gives meaning to that term by its provision that it 'shall apply with respect to all transactions in which funds are advanced to be repaid at a later date.'" *Id.* (quoting O.C.G.A. § 16-17-2(b)).

## V.    DISCUSSION

Defendants argue that Plaintiff (A) is bound by a valid and enforceable arbitration agreement; (B) the arbitration agreement encompasses Plaintiff's MLA, TILA, and GPLA claims and prohibits Plaintiff from bringing class claims, and (C) the Court should compel Plaintiff's individual claims to arbitration and stay this action pending arbitration. ECF 31.

In deciding whether to compel arbitration, a district court must determine (1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue. *Brennan*, 796 F.3d at 1130.

### A.    The MLA Renders the Arbitration Agreement Unenforceable Against Plaintiff

The parties agree that the Customer Agreement contains an arbitration agreement, and that Plaintiff agreed to the terms in the Customer Agreement.  *See* ECF 45 ¶ 101 (conceding that Plaintiff "purportedly waive[d] his right to a jury trial, waive[d] his right to participate in a class action," and submitted to "mandatory arbitration"); ECF 42 at 1.  Defendants argue that the arbitration agreement is enforceable against Plaintiff for two independent reasons: (i) the MLA only prohibits mandatory arbitration agreements, whereas Plaintiff had an opportunity to opt-out of the arbitration agreement here; and (ii) the Customer Agreement is not subject to the MLA because Defendants do not extend "consumer credit."  ECF 31 at 5–9; ECF 36 at 1–16.  Plaintiff argues that the arbitration agreement is unenforceable with respect to his claims because the MLA prohibits the enforcement of arbitration agreements in consumer credit agreements with covered servicemembers.  ECF 33 at 7–20.

"The Arbitration Act, standing alone . . . mandates enforcement of agreements to arbitrate statutory claims. Like any statutory directive, the Arbitration Act's mandate may be overridden by a contrary congressional command."  *Shearson*, 482 U.S. at 226–27.  "If Congress did intend to limit or prohibit waiver of a judicial forum for a particular claim, such an intent 'will be deducible from [the statute's] text or legislative history,' or from an inherent conflict between arbitration and the statute's underlying purposes.  *Id.* at 227 (quoting *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 628 (1985)).

#### i.    The MLA Renders the Arbitration Agreement Unenforceable Against Plaintiff Despite the Thirty-Day Opt-Out Period

Defendants argue that the arbitration agreement here is outside the scope of the MLA's arbitration ban because the arbitration agreement contains an opt-out period, so arbitration agreement does not "require" arbitration.  ECF 36 at 1–4.  Defendants argue that 10 U.S.C. § 987(e)(3) only deems "require[d]" arbitration agreements unlawful, so the MLA's ban on enforcing arbitration agreements in a following section, 10 U.S.C. § 987(f)(4), includes the same limitation.  ECF 36 at 1–4.  Plaintiff does not dispute that only "require[d]" arbitration agreements are unlawful under 10 U.S.C. § 987(e)(3).  ECF 42 at 1.  However, Plaintiff argues that § 987(f)(4)

United States District Court
Northern District of California

independently prohibits enforcement of all arbitration agreements involving the extension of consumer credit to servicemembers. ECF 36 at 1–8. Plaintiff argues that the arbitration agreement here may not be substantively *unlawful*, but it is nonetheless *unenforceable* against him under § 987(f)(4). *Id.*

The MLA contains two relevant provisions. The first, titled "Limitations," states: "It shall be unlawful for any creditor to extend consumer credit to a covered member or a dependent of such member with respect to which . . . (3) the creditor requires the borrower to submit to arbitration . . ." 10 U.S.C. § 987(e)(3). The second relevant provision is titled "Arbitration" and is contained in a section called "Penalties and remedies." *Id.* § 987(f)(4). The Arbitration subsection states: "Notwithstanding [the FAA], or any other Federal or State law, rule, or regulation, no agreement to arbitrate any dispute involving the extension of consumer credit shall be enforceable against any covered member or dependent of such a member, or any person who was a covered member or dependent of that member when the agreement was made." *Id.*

First, the Court finds that the statutory text of § 987(f)(4) plainly prohibits enforcement of any "agreement to arbitrate any dispute involving the extension of consumer credit" with a covered member or dependent. 10 U.S.C. § 987(f)(4). Section 987(f)(4) does not contain the "require[d]" qualifier that § 987(e)(3) does, nor does it contain any other language limiting the enforcement prohibition to mandatory, or "require[d]," arbitration agreements. *See Henson v. Santander Consumer USA Inc.*, 582 U.S. 79, 83 (2017) ("[W]e begin, as we must, with a careful examination of the statutory text."). This provision is directly applicable here, where Defendants seek to enforce an arbitration agreement and the parties dispute whether it "involves the extension of consumer credit." *See* 10 U.S.C. § 987(f)(4).

Second, the Court finds that this interpretation of § 987(f)(4) does not render § 987(e)(3) superfluous, because the two statutory provisions accomplish different purposes. *See Pac. Coast Fed'n of Fishermen's Ass'ns, Inc. v. Nickels*, 150 F.4th 1260, 1271 (9th Cir. 2025) ("One of 'our longstanding canons of statutory construction' is that 'we must normally seek to construe Congress's work 'so that effect is given to all provisions, so that no part will be inoperative or superfluous, void or insignificant.'") (internal quotations omitted) (citing *Ysleta del Sur Pueblo v.*

*Texas*, 596 U.S. 685, 698–99 (2022)).  Section 987(f)(4) prohibits the enforcement of arbitration agreements involving the extension of consumer credit to covered members and their dependents, providing that in cases like this one, covered members cannot be denied their day in court.  *See* 10 U.S.C. § 987(f)(4).  Section 987(e)(3), on the other hand, goes beyond governing which arbitration agreements are unenforceable—it renders entire agreements *unlawful*, which leads to additional consequences.  *See id.* § 987(f)(3) (including voiding an entire contract as an additional remedy under the MLA).  "Regardless of what Section 987(e)(3) prohibits, Section 987(f)(4) independently renders all arbitration agreements unenforceable as against military borrowers, guaranteeing that military borrowers who commence legal action will still have their day in court notwithstanding the voluntariness of any arbitration clause."  *Consumer Fin. Prot. Bureau v. MoneyLion Techs. Inc.*, No. 22-cv-8308, 2025 WL 893684, at *24 (S.D.N.Y. Mar. 24, 2025).  Thus, the fact that § 987(e)(3) does not apply to opt-out arbitration agreements does not undermine the broad prohibition on *enforcing* arbitration agreements in § 987(f)(4).  *See In re Davis*, 146 F.4th 710, 720 (9th Cir. 2025) ("Our goal is to understand the statute as a symmetrical and coherent regulatory scheme, and to fit, if possible, all parts into a harmonious whole.").

Third, the legislative history of the MLA does not support restricting the enforcement prohibition in § 987(f)(4) to "require[d]" arbitration agreements only.  Congress passed the MLA following the publication of a Department of Defense report on the impact of predatory lending on servicemembers.  *See* U.S. Dep't of Def., *Rep. on Predatory Lending Practices Directed at Members of the Armed Forces and Their Dependents* at 39, 46 (Aug. 9, 2006); *Huntco Pawn Holdings, LLC v. U.S. Dep't of Def.*, 240 F. Supp. 3d 206, 211 (D.D.C. 2016) ("In response, Congress enacted the MLA.").  The report identifies the importance of protecting judicial remedies for servicemembers, which would be undermined by Defendants' position narrowing the scope of § 987(f)(4).  *See id.* ("Service members need to have recourse to administrative remedies through state credit regulators and to judicial remedies through the courts for redress.").

Accordingly, the thirty-day opt out period does not exempt the arbitration agreement in the Customer Agreement from being unenforceable against Plaintiff under § 987(f)(4) of the MLA.

/ / /

### ii. Defendants' EWA Product is Subject to the MLA's Ban on Enforcing Arbitration Agreements Because the EWAs are "Consumer Credit"

Defendants argue that even if the opt-out period does not exempt the arbitration agreement from the MLA's arbitration ban, the MLA does not prohibit enforcement of the arbitration agreement here because Defendants' EWA product does not constitute "consumer credit." ECF 31 at 13–19; ECF 36 at 5–13. Defendants argue that the definition of "consumer credit" is not met here because (1) EWA transactions are not "credit"; and (2) EWA transactions are not subject to any "finance charges." ECF 31 at 13–15; ECF 36 at 4–16. Plaintiff argues that Defendants' EWA product is "consumer credit" because EWAs are "credit" and the fees charged by Defendants constitute "finance charges." ECF 33 at 8–20.

The MLA applies to "exten[sions] of consumer credit to a covered member or a dependent of such member." 10 U.S.C. § 987(f)(4). "[C]onsumer credit" is "credit offered or extended to a covered borrower primarily for personal, family, or household purposes, and that is: (i) Subject to a finance charge; or (ii) Payable by a written agreement in more than four installments." 32 C.F.R. § 232.3(f)(1).

### 1. Defendants' EWA Product is "Credit" Under the MLA

Defendants argue that because Defendants have "no legal or contractual claim" against customers who fail to repay an EWA, customers have no "obligation to repay." ECF 36 at 5–10. Defendants argue that without a legal "obligation to repay," the EWA does not meet the definition of "debt," and therefore, Defendants do not extend "credit" under the MLA. *Id.* Plaintiff argues that Defendants' attempt to characterize the EWA product as "non-recourse" is inapposite, and the fact that customers promise to repay through mandatory pre-authorized debits to linked bank accounts renders the EWA "credit" under the MLA. ECF 33 at 8–13.

"Credit means the right granted to a consumer by a creditor to defer payment of debt or to incur debt and defer its payment." 32 C.F.R. § 232.3(h).

The Court finds that Defendants' EWA product allows customers to "defer payment of debt" and thus, Defendants extend "credit." *Id.* The fact that the Customer Agreement limits Defendants' ability to seek *legal* recourse if customers fail to repay does not mean that customers have no obligation to repay whatsoever. *See Vickery v. Empower Finance, Inc.*, No. 25-cv-03675,

15

2025 WL 2841686, at *4 (N.D. Cal. Oct. 7, 2025) ("By providing users funds and imposing a procedure to collect those funds at a later date, [EWAs] provide consumers the right to 'incur debt and defer its payment' to [defendant] and therefore extend 'credit.'"); *Orubo v. Activehours, Inc.*, 780 F. Supp. 3d 927, 933 (N.D. Cal. 2025) (holding, in context of GPLA, the fact that statute "applies only to funds advanced 'to be repaid at a later date' does not mean that it applies only to funds *legally required to be repaid at a later date*"); *see also Olson v. Unison Agreement Corp.*, No. 23-2835, 2025 WL 2254522, at *3 (9th Cir. Aug. 7, 2025) (finding statute's definition of "consumer credit obligation" does not require *legal* recourse).

Here, customers can only secure an EWA if they link a bank account and consent to mandatory debits upon receipt of their next paycheck. ECF 45 ¶¶ 74, 87; Bell Decl., Ex 1 at 1, 4. If customers fail to repay an EWA, customers cannot initiate another transaction until money is deposited into their account, which is automatically debited to fulfill the late repayment obligation. ECF 45 ¶ 90; Bell Decl., Ex. 1 at 3 ("Oasis warrants that it has no legal or contractual claim against you based on a failure to repay an [EWA], but Oasis reserves the right to suspend your access to the services until you repay an [EWA] in full."). Although Defendants secure repayment through means other than "legal recourse," the Court finds that Defendants nevertheless offer a product that requires promise of repayment, and therefore constitutes "credit." *See Orubo* (holding that practice of "debit[ing] a borrower's bank account immediately after their employer deposits their paycheck on payday" "falls squarely within the definition of credit under TILA"); *compare* 15 U.S.C. § 1602(f) (TILA definition of credit) *with* 32 C.F.R. § 232.3(h) (MLA definition of credit).

Moreover, official regulatory commentary to the TILA (which has a nearly identical definition of credit), expressly defines EWA products as "credit." *See* 12 C.F.R. § 1026, Supp. I, Paragraph 2(a)(14), ¶ 2 ("Credit includes a transaction in which a cash advance is made to a consumer in exchange for the consumer's personal check, or in exchange for the consumer's authorization to debit the consumer's deposit account, and where the parties agree either that the check will not be cashed or deposited, or that the consumer's deposit account will not be debited, until a designated future date."). *See Vickery*, 2025 WL 2841686, at *5 (applying Regulation Z's

16

definition of "credit" to extension of credit under the MLA); *see also Orubo*, 780 F. Supp. 3d at 936 (holding commentary to TILA implementing regulations is entitled to "deference").

Finally, because the MLA was designed to protect customers from predatory loans, the statutory text must be read broadly. *See Burnett v. Ala Moana Pawn Shop*, 3 F.3d 1261, 1262 (9th Cir. 1993) (holding that because TILA was designed "to protect consumers," courts should "look[] past the form of the transactions to their economic substance in deciding whether the Act appl[ies]"). Interpreting the MLA's definition of credit (and associated definition of debt) as requiring a *legal* obligation to repay, and not just a functional, transactional obligation to repay, allows creditors to skirt the consumer protection functions of the statute and reads a limitation into the statute that does not exist. *See Orubo*, 780 F. Supp. 3d at 934 (finding obligation to repay where customers are required to pass a credit check and link account that receives direct payroll deposits to facilitate repayment).

Defendants' representations to customers further support a mutual understanding that customers must repay the EWA. ECF 45 ¶ 84 (displaying "repayment date"); *see Orubo*, 780 F. Supp. 3d at 934 (recognizing that customers "believe that they are required to pay its cash advances" where website states that "[e]arnings are repaid when your paycheck hits"). The ability for Defendants to monitor when new funds are deposited into a customer's account and immediately, without warning, withdraw the replenished funds, is no less significant than other contractual or legal mechanisms to enforce repayment. Bell Decl., Ex. A at 2 (describing that Oasis may collect repayment "any time Oasis becomes aware of a positive cash inflow into your linked bank account . . . even if that available cash isn't enough to pay the full amount owed on the [EWA]"). Rebranding high interest, short term loans as "non-recourse" does not obscure the fact that EWAs essentially offer short-term payday loans for customers who cannot afford to wait.

Accordingly, Defendants' EWA product constitutes "credit" under the MLA.

### 2. Defendants' Expedite Fees are "Finance Charges" Under the MLA

Defendants argue that even if the EWA transactions involve "credit," EWAs are not "consumer credit" under the MLA because the transactions are not subject to finance charges and the EWAs are repaid in one single installment. ECF 31 at 16–21; ECF 36 at 11–16. Plaintiff

argues that the expedite fees and subscription fees charged by Defendants are "finance charges" because these charges are "incident to" the extension of credit.  ECF 33 at 13–20.

"Consumer credit means credit offered or extended to a covered borrower primarily for personal, family, or household purposes, and that is: (i) Subject to a finance charge; or (ii) Payable by a written agreement in more than four installments."  32 C.F.R. § 232.3(f)(1).  Finance charge has the same meaning as 'finance charge' in Regulation Z."  32 C.F.R. § 232.3(n).  "The finance charge is the cost of consumer credit as a dollar amount. It includes any charge payable directly or indirectly by the consumer and imposed directly or indirectly by the creditor as an incident to or a condition of the extension of credit. It does not include any charge of a type payable in a comparable cash transaction."  12 C.F.R. § 1026.4.

The Court finds that Defendants' expedite fees constitute finance charges even though the expedite fees are not expressly mandatory.  *See Vickery*, 2025 WL 2841686, at *6 (finding nonmandatory expedite fees constitute "finance charges").  Defendants charge "expedite fees" in connection with the extension of credit, which is sufficient to satisfy the "incident to" requirement defined at 12 C.F.R. § 1026.4.  *See Orubo*, 780 F. Supp. 3d at 937 (holding that nonmandatory "express fees" are finance charges because "incident to" requires "a necessary connection," not a "necessary condition") (citing *Household Credit Servs., Inc. v. Pfennig*, 541 U.S. 232, 240–41 (2004) ("[T]he phrase 'incident to or in conjunction with' implies some *necessary* connection between the antecedent and its object.")).  *Cf. Lembeck v. Arvest Cent. Mortg. Co.*, 498 F. Supp. 3d 1134, 1136 (holding that under Fair Debt Collection Practices Act, fees "paid for the benefit of using an expedited means of making the mortgage payment" are incidental to the payment of the principal obligation, because "[t]he only plausible reading of the word 'incidental' in this context is as a reference to something that is connected to but far less significant than the underlying debt").  Here, the expedite fees are "incident to" the EWAs because the expedite fees impact the timing of funds, which is "a material term of credit."  *Orubo*, 498 F. Supp. 3d at 938; see ECF 45 ¶ 47; 12 C.F.R. § 1026.4(a).

Knowing their cash-strapped customer base, Defendants represent to customers that they can secure EWAs "instantly," *see* ECF 45 ¶ 56, and Defendants even advertise that 98% of EWAs

18

arrive "within fifteen minutes," *id.*, thereby making express delivery a material term of credit. *See Vickery*, 2025 WL 2841686, at \*6 ("[B]y advertising and encouraging [EWA's] ability to provide instant funds, [defendant] has made instant extension of credit a material term of its [EWA] product."). Plaintiff, as an example, paid to expedite all three of the EWAs mentioned in his complaint. ECF 45 ¶ 98. Plaintiff only had two to six days before repaying the EWAs, demonstrating the short-term nature of EWAs and the high likelihood that customers must expedite EWAs for the credit to be useful. *See id.*

Moreover, Defendants have not shown that the expedite fees here are "of a type payable in a comparable cash transaction," which would render them exempt from the "finance charge" definition. *See* 12 C.F.R. § 1026.4. To satisfy this exception, there must be comparable fees charged in the context of non-credit products. *Id.* Defendants rely on a now-terminated CFPB order to make this point, but the CFPB order is inapposite. CFPB, Payactiv Approval Order, at 5 (Dec. 30, 2020), https://files.consumerfinance.gov/f/documents/cfpb_payactiv_approval-order_2020-12.pdf, terminated on other grounds by CFPB, Order to Terminate Sandbox Approval Order (June 30, 2022), https://files.consumerfinance.gov/f/documents/cfpb_payactiv_termination-order_2022-06.pdf. The CFPB held that an expedite fee associated with a different EWA product was analogous to other "transfer fees for non-credit products" and thus, was exempt from the "finance charge" definition. *Id.* However, a defining feature of the expedite fee in the CFPB order was that it *did not* "vary based on . . . the amount of the transaction." *Id.* Here, the expedite fees are distinguishable because they *do* vary based on the amount of the transaction, so the fees here do not resemble the transfer fees, "out-of-network ATM fees," or other fees cited by the CFPB. *See* ECF 45 ¶¶ 53, 98 (Plaintiff paid $4 to expedite a $75 EWA, and $5 to expedite a $100 EWA). Accordingly, the CFPB's analysis in the Payactiv Approval Order does not bear on the Court's determination that Defendants' expedite fees meet the definition of a finance charge.

Accordingly, the expedite fees charged by Defendants constitute "finance charges" under the MLA. Since the imposition of a finance charge is sufficient to render credit "consumer credit," the Court's inquiry ends here and the Court need not examine the parties remaining arguments about (1) whether subscription fees also constitute finance charges, or (2) whether the

19

credit is "payable by a written agreement in more than four installments." *See* 32 C.F.R. § 232.3(f)(1) ("Consumer credit means credit . . . that is (i) Subject to a finance charge; *or* (ii) Payable by a written agreement in more than four installments") (emphasis added); *see Orubo*, 780 F. Supp. 3d at 938 (holding product constitutes "consumer credit" when expedite fee is found to be a "finance charge").

\*        \*        \*

Hence, Defendants' EWA product constitutes "consumer credit" under the MLA. Because the MLA prohibits the enforcement of arbitration agreements "involving the extension of consumer credit," the arbitration agreement in the Customer Agreement is unenforceable against Plaintiff under the MLA. *See* 10 U.S.C. § 987(f)(4); *See Vickery*, 2025 WL 2841686, at \*7–8 (holding that EWAs constitute "consumer credit" and MLA prohibits enforcing arbitration of related disputes).

### B.    Because the Arbitration Agreement is Unenforceable Against Plaintiff, Plaintiff's Individual Claims Cannot be Compelled to Arbitration and Plaintiff's Class Claims Cannot be Struck

Defendants argue that even if the MLA prohibits arbitration of Plaintiff's MLA claims, Plaintiff's TILA and GPLA claims still must be submitted to arbitration. ECF 36 at 17–18; ECF 43 at 3. Defendants also argue that Plaintiff's class claims must be struck, since Plaintiff waived his ability to bring class action claims as part of the arbitration agreement. ECF 31 at 10. Plaintiff argues that the MLA renders the entire arbitration agreement unenforceable against Plaintiff and prohibits compelling arbitration of "any dispute" involving the extension of consumer credit to covered members, including disputes under the TILA and GPLA. ECF 33 at 21–22. Plaintiff also contends that because the class action waiver is contained within the unenforceable arbitration agreement, the class action waiver also cannot be enforced against Plaintiff's class claims. ECF 33 at 21–22. Finally, Plaintiff maintains that the MLA independently bans the class action waver. ECF 33 at 21–22.

The MLA states that "no agreement to arbitrate *any dispute involving the extension*

20

*of consumer credit shall be enforceable against any covered member* or dependent of such a member, or any person who was a covered member or dependent of that member when the agreement was made." 10 U.S.C. § 987(f)(4) (emphasis added).

The Court finds that because all of Plaintiff's claims are about the same dispute involving an extension of credit to covered servicemembers, the MLA prohibits compelling arbitration of all of Plaintiff's claims. *Id.*; *see Vickery*, 2025 WL 2841686, at \*8 (holding MLA prohibits arbitration of related TILA and GPLA claims). Whether the TILA or the GPLA contain independent bans on arbitration is inapposite, *see* ECF 31 at 20, given the MLA's broad coverage. 10 U.S.C. § 987(f)(4). The plain text of the statute does not limit the arbitration ban to the arbitration of claims brought under the MLA itself, and Defendants cite no binding or persuasive authority that suggests otherwise. *See* 10 U.S.C. § 987(f)(4).

Rather, when the MLA applies, the entire arbitration agreement is unenforceable and the parties cannot be compelled to arbitrate any covered dispute. *Id.*; *see Vickery*, 2025 WL 2841686, at \*8 ("Under a straightforward reading of Sections 987(e)(3) and 987(f)(4), because [defendant] is a creditor extending consumer credit, no lawful or enforceable arbitration agreement exists between [defendant] and [plaintiffs], whom [defendant] does not dispute are Covered Members.").

Here, Plaintiff's TILA and GPLA claims involve the same extension of consumer credit to covered servicemembers as his MLA claims, so the MLA also bans arbitration of these claims. ECF 45 at 27–30. The supplemental authority cited by Plaintiff supports this interpretation of the MLA's broad scope. *See Moss v. Cleo AI Inc.*, No. C25-879, 2025 WL 2592265, at \*5 (W.D. Wash. Sept. 8, 2025) ("Because [plaintiff's] TILA claim is inextricably linked to the same set of facts as his MLA claim, it is also subject to this MLA-created exception to the FAA's mandate favoring arbitration."). Although the Ninth Circuit has not yet addressed an attempt to compel related disputes to arbitration pursuant to an agreement the MLA renders unenforceable, other courts have. *See, e.g.*, *Steines v. Westgate Palace, L.L.C.*, 113 F.4th 1335, 1344 (11th Cir. 2024) ("If the MLA applies to a contract involving the extension of consumer credit, the district court cannot enforce any agreement in that contract to arbitrate any dispute."). Accordingly, Plaintiff cannot be compelled to arbitrate Plaintiff's individual claims under the MLA, TILA, or GPLA.

United States District Court
Northern District of California

21

Finally, since MLA renders the arbitration agreement unenforceable against Plaintiff, the class action wavier contained within the arbitration agreement is also unenforceable against Plaintiff. *See* Bell Decl., Ex. 1 ¶ 26 ("DISPUTE RESOLUTION BY BINDING ARBITRATION; JURY TRIAL & CLASS WAIVER"). Defendants move to strike Plaintiff's class claims on the grounds that they "that are expressly waived *under the relevant arbitration agreement*." ECF 31 (Notice of Motion) (emphasis added); ECF 31 at 10–11 ("The Arbitration Agreement expressly waives class actions.") ("It is well settled that class action waivers must be upheld *in arbitration agreements*.") (emphasis added) ("Because the Arbitration Agreement contains an express waiver of class or collective arbitration, the Court must compel Plaintiff to arbitrate his claims on an individual basis.").

The Court has already determined that the MLA renders the arbitration agreement unenforceable against Plaintiff, as such, the class action waiver contained within it is also unenforceable against Plaintiff. *See id.* (referencing "disputes about the validity, enforceability, coverage, or scope of this Arbitration Agreement or any part thereof (including, without limitation, the Class Action Waiver)"); 10 U.S.C. § 987(f)(4) ("[N]o agreement to arbitrate any dispute involving the extension of consumer credit shall be enforceable against any covered member . . .."). Accordingly, the class action wavier contained within the arbitration agreement is also unenforceable against Plaintiff, so the Court denies Defendants' motion to strike Plaintiff's class claims on the grounds that the arbitration agreement prohibits Plaintiff from bringing them.

However, this Order does not bear on other issues that may arise regarding Plaintiff's class claims. Plaintiff's proposed TILA Class and Georgia Class definitions do not distinguish between individuals who are covered by the MLA's protections and those who are not. *See* ECF 45 at 23. In the instant motion, Defendants only seek to demonstrate the existence of an enforceable arbitration agreement *with Plaintiff*, and thus, the Court only decides whether to compel *Plaintiff's* individual claims to arbitration and whether the arbitration agreement prevents Plaintiff from bringing his class claims in the first instance. *See Vickery*, 2025 WL 2841686, at *8 (limiting ruling to the arbitrability of plaintiff's claims where defendants only "demonstrate the existence of an arbitration agreement with" plaintiff).

United States District Court
Northern District of California

22

At this time the Court takes no position on whether the arbitration agreement may be enforceable against other members of the putative TILA or Georgia Classes.  If other putative class members are servicemembers covered by the MLA, like Plaintiff, the arbitration agreement may be unenforceable with respect to their claims for the reasons as described herein. Additionally, the question of whether some class members are subject to binding arbitration agreements where others are not may defeat class certification at a later stage of litigation.  *See id.* at *8 (recognizing that putative class members may include customers who are not covered by the MLA, so a future class certification motion may be defeated by the enforceability of arbitration agreements against those putative class members).

### C.    No Stay is Warranted

Defendants argue that the Court should stay this action pending arbitration of Plaintiff's individual claims.  ECF 31 at 21.  Plaintiff argues that no stay is warranted since none of Plaintiff's claims can be compelled to arbitration.  ECF 33 at 21.

"When a district court finds that a lawsuit involves an arbitrable dispute, and a party requests a stay pending arbitration, § 3 of the FAA compels the court to stay the proceeding." *Smith v. Spizzirri*, 601 U.S. 472, 478 (2024); *see* 9 U.S.C. § 3.

Because Plaintiff's claims have no arbitrable dispute, no stay is warranted. *Smith*, 601 U.S. at 478.  Accordingly, the Court **DENIES** Defendants' motion to stay as moot.

### VI.    CONCLUSION

For the reasons stated above, the Court **GRANTS** Defendants' request for judicial notice and **DENIES** Defendants' motion to stay the action in favor of compelling Plaintiff's individual claims arbitration.  The Court also **DENIES** Defendants' motion to strike class claims on the grounds that the arbitration agreement prohibits Plaintiff from bringing them.

The stay is lifted pursuant to ECF 50.  *See* ECF 26.  Defendants have until November 20, 2025 to answer or otherwise respond to Plaintiff's complaint.  *Id.*

//

//

United States District Court
Northern District of California

This Order resolves ECF 31, ECF 32.

IT IS SO ORDERED.

Dated: November 5, 2025

_____
TRINA L. THOMPSON
United States District Judge

Government Shutdown:
10/1/25 midnight to present
07/16/2028

24